RELIANCE INSURANCE COMPANY

v.

The UNITED STATES,

J. H. Baxter & Company, Third-Party Defendant.

No. 146–79L.

United States Court of Claims.

April 21, 1982.

Kevin P. Nolan, San Francisco, Cal., attorney of record, for plaintiff.

Nancy L. Long, Washington, D. C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D. C., for defendant.

James C. Martin, Oakland, Cal., for J. H. Baxter & Co., third-party defendant. John A. Reding, Oakland, Cal., attorney of record, for J. H. Baxter & Co.

Before FRIEDMAN, Chief Judge, and KUNZIG * and BENNETT, Judges.

## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

This case involves an action by plaintiff to recover from defendant the costs incurred in the cleanup and removal of oil spilled into one of the navigable waterways of the United States. Jurisdiction is based on the Federal Water Pollution Control Act, as amended in 1972, Pub.L.No.92–500, sec. 2, title III, § 311(i)(1), 86 Stat. 868, 33 U.S.C. § 1321(i)(1) (1976).[1] The specific question presented is whether the oil spill "was caused solely by * * * an act or omission of a third party" within the meaning of section 1321(i)(1)(D). The case is now before the court on cross-motions for summary judgment. For the reasons set forth hereafter, we deny plaintiff's claim and grant defendant's motion for summary judgment.

### I

Plaintiff, Reliance Insurance Company, is the insurance carrier for the Smith-Rice Company (hereinafter Smith-Rice), a California enterprise engaged in the business of maritime barge and derrick operations. Smith-Rice owns real property located at 2199 Clement Avenue, Alameda, California,

---

\* Judge Robert L. Kunzig died February 21, 1982. He participated in the oral argument and agreed to the determination in this case before his death.

1. Section 1321(i)(1) states:

"In any case where an owner or operator of a vessel or an onshore facility or an offshore facility from which oil or a hazardous substance is discharged in violation of subsection (b)(3) of this section acts to remove such oil or substance in accordance with regulations promulgated pursuant to this section, such owner

or operator shall be entitled to recover the reasonable costs incurred in such removal upon establishing, in a suit which may be brought against the United States Government in the United States Court of Claims, that such discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether such act or omission was or was not negligent, or of any combination of the foregoing causes."

which borders the Alameda Estuary, a navigable waterway of the United States running between Alameda and Oakland, California.

In 1976, Smith-Rice decided to dredge a portion of its Clement Avenue property and remove 75 existing wood pilings and other timber debris in order to extend its waterfront sheetpile bulkhead 200 feet and to add a graded rip-rap slope, thereby creating a permanent shoreline wall. This project was intended to create additional mooring space for Smith-Rice's derrick barges and other floating equipment, replace deteriorating wood pilings and generally reclaim ground which had been gradually lost through action of the tidal canal. Prior to commencing the dredging, Smith-Rice secured approval from the proper local, state and federal authorities.

Since the dredged material was to be disposed of in the San Francisco Bay at a site near Alcatraz Island, Smith-Rice retained the soil engineering firm of Lawney-Kaldveer Associates to conduct test borings and to take core samples from various elevations and depths within the area to be dredged. This was done to determine whether or not the soil showed evidence of or contained pollutant materials. Results from these tests failed to reveal the existence of any subsurface pollutants. However, on or about March 11, 1977, while engaged in its dredging operations, Smith-Rice uncovered an underground deposit of an oily pollutant which discharged into the Alameda Estuary. Smith-Rice immediately notified the United States Coast Guard, which undertook to clean up the spill at a cost of $36,815.28. This expense was paid by plaintiff, as insurer for Smith-Rice. On April 16, 1979, plaintiff filed a petition in this court to recover from the United States the amount of this payment.[2]

**2.** Under California law, as a result of its insurance payment, plaintiff became subrogated to the claim of its insured, Smith-Rice, against the United States. Plaintiff brings this action as subrogee under the authority of *Quarles Petroleum Co. v. United States*, 213 Ct.Cl. 15, 551 F.2d 1201 (1977).

## II

Before addressing plaintiff's claim, it is useful to first trace the development and composition of the federal oil pollution control standards. Prior to 1970, the government's statutory remedy for recovery of the costs of cleaning up oil spills into and upon the navigable waters of the United States was the Oil Pollution Act, 1924, Pub.L.No. 68–238, 43 Stat. 604 (1924), as amended by the Clean Water Restoration Act of 1966, Pub.L.No.89–753, title II, sec. 211(a), 80 Stat. 1252.[3] Such recovery required proof of gross negligence or willful conduct by the discharging vessel. *See Sabine Towing & Transp. Co. v. United States*, 229 Ct.Cl. ——, ——, 666 F.2d 561, 563 (1981); *Matter of Oswego Barge Corp.*, 664 F.2d 327, 332–33 (2d Cir. 1981). However, the increasing sophistication of modern commerce and the exigencies of environmental protection soon rendered this remedy inadequate. In addition to the limited scope of liability, the statute applied only to vessels and not at all to spills from fixed installations. Moreover, the 1924 Act was confined to oil, providing no protection against other potentially hazardous substances. *See* H.R.Rep.No.91–127, 91st Cong., 2d Sess. 2 (1970), *reprinted in* [1970] U.S.Code Cong. & Ad.News 2691, 2692.

The Water Quality Improvement Act of 1970 added the now existing provisions to the Federal Water Pollution Control Act to correct these deficiencies. Pub.L.No.91–224, title I, sec. 102, 84 Stat. 91 [formerly codified at 33 U.S.C. § 1161 (1970)]. In 1972, during a comprehensive restructuring of water pollution laws, the oil spill cleanup provisions of section 102 were reenacted, in slightly modified form, as section 311 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1321 (1976) (hereinafter section 1321). Pub.L. No.92–500, sec. 2, title III, 86 Stat. 862 (1972).

**3.** Codified at 33 U.S.C. §§ 431 to 437; repealed by Pub.L.No.91–224, title I, sec. 108, 84 Stat. 113 (1970).

As presently constituted, the Federal Water Pollution Control Act flatly prohibits the discharge of harmful quantities of oil or hazardous substances into the navigable waters of the United States. 33 U.S.C. § 1321(b)(3). The statute holds owners or operators of discharging vessels and facilities strictly liable for actual cleanup costs, subject to certain limited defenses. 33 U.S.C. § 1321(f)(1)–(3). Upon proof of one of these defenses, an owner or operator is entitled to recover its reasonable cleanup costs from the United States. 33 U.S.C. § 1321(i)(1).

### III

The conditions for imposition of absolute liability having otherwise been met,[4] plaintiff seeks recovery under section 1321(i)(1)(D) by contending that the deposit of subsurface oil it discovered was the result of the acts or omissions of third parties including former but unrelated owners of the Clement Avenue property.[5]

Section 1321(i)(1)(D) requires, as a precondition to reimbursement, that the discharge be *caused solely by * * * an act or omission of a third party.* (Emphasis added.) We are called upon to decide the precise meaning of this statutory language. Each party has examined the statute, its legislative history and our prior decisions and, thereon, advances its own interpretation of the third-party exception in support of its respective position.

Plaintiff contends that an act or omission of an owner or operator is not a cause of a spill if committed without fault. According to plaintiff, an owner or operator can recover under section 1321(i)(1)(D) when it can be shown (1) that the act or omission of a third party was a cause of the spill and (2) that even though the spill would not have occurred "but for" some act or omission of the claimant, the act or omission was neither willful nor negligent. In other words, in plaintiff's view, the question of whether or not the spill was "caused solely by" the act or omission of a third party turns on whether Smith-Rice acted with reasonable care. Supporting this interpretation of the law, plaintiff alleges that Smith-Rice took reasonable precautions before dredging by testing for subsurface pollutants and that its lack of knowledge as to the existence of the oil deposit absolves it from culpability, thereby rendering the third party solely responsible for the spill.

In response, defendant construes section 1321(i)(1)(D) to require that a claimant first establish that a third party was the "immediate cause" of the spill and then show that it did not contribute to the spill through some negligent act or omission. Defendant submits that the act or omission of a third party was not solely responsible for the oil spill since the dredging by Smith-Rice was the immediate cause of the discharge. Defendant relies heavily on the fact that section 1321 imposes strict liability on the owners or operators of facilities discharging oil, pointing out that the exceptions to this liability are to be narrowly construed. Since the statute calls for absolute liability with narrow specified exceptions, defendant

---

**4.** For purposes of this discussion, we assume (as have the parties), without deciding, that Smith-Rice is strictly liable under section 1321 for the oil spill in this case.

**5.** For purposes of this discussion, we assume that the existence of the deposit of an oily pollutant resulted from the act or omission of a third party. We note, however, that this fact has not been established by plaintiff. Subsequent to filing its answer herein, defendant was advised by plaintiff that J. H. Baxter and Company (hereinafter Baxter), a California corporation, was the previous owner of the property at 2199 Clement Avenue, which plaintiff alleges by its complaint to be the third party whose acts or omissions were the sole cause of the oil spill herein. On or about November 5, 1979, in response to a motion made by defendant, notice was served upon Baxter to appear in this action and assert any interest it might have in the subject matter of this case. In its petition, filed December 13, 1979, Baxter acknowledged that it was the former owner of real property located at 2201 Clement Avenue, Alameda, California, "at or near 2199 Clement Avenue" but alleged that it had sold all of its interest in the property in 1969 to one John Bentzen, and that it was not in any way responsible for the oil spill. Baxter's petition and memorandum supports the summary judgment motion of the United States.

maintains that it is irrelevant that Smith-Rice took reasonable precautions and that the oil spill was an unforeseeable occurrence.

## IV

■ We find neither of the foregoing positions of the parties to be wholly consistent with the statute. As previously stated, section 1321 imposes absolute liability on an owner or operator for an oil spill, limited only where the spill is "caused solely by" one or more of four enumerated exceptions. It is implicit in this limitation that the conduct of the owner or operator cannot be a contributing cause of the spill. *City of Pawtucket v. United States*, 211 Ct.Cl. 324, 326–27 (1976). Thus, correlative to any inquiry into whether a spill was caused solely by a third party is an evaluation of the owner's or operator's own conduct. Where the act or omission of an owner or operator is a necessary antecedent to the spill, it is a contributing cause which bars recovery. *Union Petroleum Corp. v. United States*, 228 Ct.Cl. ——, ——, 651 F.2d 734, 745 (1981).

Plaintiff would have us mitigate this result, however, in instances where an owner or operator could establish that his conduct was not negligent. This we cannot sanction, for there is no standard of limited liability incorporated within the exception of section 1321(i)(1)(D). To the extent that the parties read our prior precedents to entertain such a notion, their interpretation constitutes an unwarranted expansion of the reasoning underlying those decisions.

When this court has had prior occasion to consider the scope of the third-party exception, it has been only required to determine whether some omission on the part of the owner or operator facilitated the spill; that is, whether the owner's or operator's failure to act amounted to conduct which contributed to the spill to such an extent that it could not be said that the independent act or omission of a third party was the sole cause. While the affirmative actions of an owner or operator are easily identified and, therefore, are readily susceptible to evaluation, an omission to act is only understood within the framework of a legal duty to act. Absent a legal duty to act, a pre-existing, passive condition cannot be fairly held an omission for causative purposes.

A legal duty to act may be restated as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct. With respect to section 1321 this standard of conduct must reflect Congress' strong concern for the protection of the nation's water resources and is, accordingly, very high.[6] Yet, to give practical effect to the statutory exceptions, this standard of conduct must necessarily be less than absolute. Consequently, in recognition of this congressionally ordained standard of conduct, the court has had need to articulate, at various times, the requisite degree of care needed to satisfy an owner's or operator's legal duty. *See, e.g., Union Petroleum Corp.*, 228 Ct.Cl. at ——, 651 F.2d at 746 (" 'reasonable care' as required by the Act"); *Chicago, Milwaukee, St. Paul & Pac. R. R. v. United States*, 216 Ct.Cl. 155, 159, 163, 575 F.2d 839, 841, 843 (1978) ("required level of reasonable care"); *Proctor Wholesale Co. v. United States*, 215 Ct.Cl. 1049, 1050 (1978) ("required level of reasonable care"). It is only within this context that the concept of due care has found expression in our prior decisions. Plaintiff is decidedly mistaken in its effort to extend this concept beyond its obvious, but limited, utility in defining the legal duty to which an owner or operator is bound to conform.

In the present case, since we are confronted with an affirmative act, rather than an omission to act, on the part of Smith-Rice, we need not repeat such an analysis. Under these circumstances, we proceed directly to a determination of whether this act was a contributing cause

---

**6.** Congressional policy is set forth directly in the statute. Section 1321(b)(1) provides: "The Congress hereby declares that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States * * *."

of the discharge into the Alameda Estuary, such as to preclude the act or omission of any third party from being the sole cause thereof.

Defendant endeavors to persuade us that we should read "caused solely by" to mean the immediate cause of the spill. While such an interpretation may be plausible under the particular facts of this case, its obvious emphasis on considerations of timing suggests a purely mechanical administration that could, in certain situations, lead to anomalous and unjust results.[7] We are, therefore, unable to embrace this argument.

Instead, it appears to us that the proper construction to be given to the phrase "caused solely by" can be drawn from the purpose and intent of the statute itself. The legislative history of section 1321 demonstrates Congress' desire for a comprehensive solution to the nation's oil spill problem. After lengthy and extensive discussion, Congress determined that a system of absolute liability with specified limits best protected the public interest. Such a system, it was felt, properly placed the cost for an oil spill on the responsible party, and not on the general public.[8] After deciding on the nature of the liability, Congress then considered the circumstances under which an owner or operator should be exempt from the imposition of such liability. Only in those instances which Congress believed

to be completely beyond the control of the owner or operator would they be excused from liability.[9] Any conduct, however slight, on the part of an owner or operator contributing to a spill would negate relief, even though such conduct might have operated in concert with greater third-party conduct to produce the spill. In other words, only where the owner's or operator's conduct was so indirect and insubstantial as to displace him as a causative element of the discharge would he be relieved of responsibility and, correspondingly, financial liability.[10]

## V

Viewed in this light, we cannot say that the activities of Smith-Rice were so indirect and insubstantial as to not be a cause of the subject oil spill. While the existence of the deposit of oil may have resulted from the act or omission of a third party, it is undeniable that it was Smith-Rice's dredging which allowed that oil to discharge into the Alameda Estuary. To us, this dredging was a significant element in the causal chain leading to the ultimate spill, since without this direct intervention it is reasonable to assume that the deposit of oil eventually dislodged would have remained undisturbed.

7. For example, if a third party was to conceal an explosive device on an oil tank and rig the device to explode when the unsuspecting owner of the tank turned on a light switch, the act of turning on the light switch would certainly be the "immediate" cause of any resulting oil spill. However, it is difficult to understand why this owner should be denied recovery of any cleanup costs while an owner whose oil tank was destroyed by a third party who both planted and set off an explosive device would be entitled to reimbursement.

8. S.Rep.No.91–351, 91st Cong., 1st Sess. 5 (1969), U.S.Code Cong. & Admin.News 1970, p. 2691 (report of the Senate Committee on Public Works to accompany S. 7. S. 7 was the predecessor of the Senate-House Conference Committee version of the 1970 Federal Water Pollution Control Act amendments. Section 1321 had its origin in that bill.)

9. S.Rep.No.91–351, 91st Cong., 1st Sess. 5–6 (1969). Further on, at page 6, the Committee observed: "[W]hile the owner or operator should not be liable if he [can] prove that a discharge was caused by one of these [exceptions], it [is] also necessary that such exceptions be allowed only when the owner or operator prove[s] the discharge to be solely the result of one of the exceptions."

See Travelers Indemnity Co. v. United States, Ct.Cl. No. 469–80L (order entered March 30, 1982).

10. Our prior decisions are in harmony with this narrow interpretation of the third-party exception. From a careful evaluation of these decisions, it is evident that in each case in which a third party was held not to be the sole cause of a spill, the contribution of the owner or operator to the chain of events leading to the spill was not sufficiently indirect and insubstantial so as to absolve him of at least partial responsibility for the incident.

Therefore, it is concluded that the acts of Smith-Rice were a contributing cause to the oil spill and that, consequently, the spill was not caused solely by the act or omission of any third party as required by the statute. Plaintiff has failed to establish its right to recovery under section 1321(i).

Accordingly, defendant's motion for summary judgment is granted, plaintiff's cross-motion for summary judgment is denied, and the petition of Reliance Insurance Company is dismissed. J. H. Baxter & Company, third-party defendant, is dismissed. To the extent that the motion of Reliance to compel answers to its interrogatories has not previously been ruled upon, it is denied as mooted.