556 So.2d 1177 (1990)
SUNSHINE JR. STORES, INC., Appellant,
v.
STATE of Florida, DEPARTMENT OF ENVIRONMENTAL REGULATION, Appellee.
No. BQ-98.
District Court of Appeal of Florida, First District.
February 2, 1990.
*1178 Wilbur E. Brewton and Janice G. Scott, Tallahassee, for appellant.
E. Gary Early, Asst. Gen. Counsel, DER, Tallahassee, for appellee.
EN BANC
THOMPSON, Judge.
Sunshine Jr. Stores, Inc. (Sunshine) appeals a final order of the State of Florida, Department of Environmental Regulation (DER) finding Sunshine, the present owner of the property, jointly liable with a former owner for the cleanup of its property which had become polluted by a leaking underground gasoline storage tank. We reverse.
From 1979 to 1984 K & F Services, Inc. (K & F) owned and operated an Amoco Service Station located on U.S. Highway 98 in Bay County. Gasoline for sale at the station was stored on the premises in underground tanks. Sometime prior to October 1984 K & F ceased to operate the service station. The gas pumps and other equipment were removed, but the underground tanks were not. The tanks were apparently substantially emptied at this time, leaving only three inches of gasoline remaining in each of the three tanks. On October 17, 1984, K & F sold the property to Sunshine, which purchased it with the intention of removing the existing structure and replacing it with a modern convenience store and gas station. At the time of the purchase Sunshine knew that the property had formerly been a service station and knew that the old gasoline storage tanks were still in the ground on the site. Sunshine did not intend to, and did not, do any business on the site using the existing improvements. Instead it immediately hired contractors and began to remove all existing improvements, including the tanks, so as to prepare the site for the new construction. In January 1985 a contractor began removing the existing concrete slab over the underground tanks, at which time he smelled gasoline and notified Sunshine. Sunshine then reported the apparent gasoline leak to DER. Subsequently, it was determined that one of the storage tanks had leaked and that the soil and groundwater beneath the site were polluted with gasoline. It was further determined that gasoline which had previously leaked from the tank was continuing to seep through the soil and into the water table beneath the site, and posed a potential threat to the water table and water wells located nearby.
In a Notice of Violation and Order for Corrective Action dated April 8, 1985 DER named both Sunshine and K & F as respondents, and alleged, in part: (1) that DER is the agency charged with administering Chapters 376 and 403, Fla. Stat. and rules promulgated thereunder; (2) that K & F's activity on the property currently owned by Sunshine resulted in a discharge of refined petroleum products upon the lands and waters of the state; (3) that the discharge from K & F's tank had contaminated groundwater and constituted an odor nuisance, an imminent and substantial danger to public health, and was impairing the reasonable beneficial use of adjacent waters; and (4) that upon application of Chapters *1179 376 and 403, Fla. Stat. and Fla. Admin. Code Rules Chapters 17-3 and 17-4, to the facts of the case, the respondents were in violation of § 376.302, Fla. Stat., (prohibiting discharge of refined petroleum products upon waters and lands of the state); Fla. Admin. Code Rule 17-3.402(1) (requiring that all groundwaters at all places and times be free from toxic pollutants); § 403.161(1)(a), Fla. Stat., (prohibiting pollution harmful to human, animal, aquatic or plant life, or property); and § 403.161(1)(b), Fla. Stat., (making it unlawful for any person to violate any lawful rule or regulation of the Department). The notice of violation did not specifically mention § 403.087, Fla. Stat., relating to the requirement of a permit by a stationary installation which could reasonably be expected to be a source of water pollution.
Upon receipt of the notice of violation, both Sunshine and K & F filed petitions for Chapter 120 proceedings. In its petition for formal administrative hearing, Sunshine denied the charges set out in the notice of violation and asserted as an affirmative defense that any discharge of petroleum products which may have occurred prior to its acquisition of the property was the responsibility of its predecessors in title. At the same time Sunshine filed a motion to dismiss arguing that because the discharge occurred prior to its purchase and use of the property, it had no legal responsibility for the cleanup. In its response to Sunshine's motion to dismiss, DER again failed to specifically allege Sunshine to be in violation of § 403.087, Fla. Stat. Instead, DER realleged violations of Chapter 403, Fla. Stat. generally, and asserted that Sunshine's property was a source of pollution and was a "stationary installation" as defined in Chapter 403.
On April 21, 1986, a formal administrative hearing was held, and on June 4, 1986, the hearing officer entered a recommended order wherein he concluded, in part: (1) that the evidence affirmatively proved that the gasoline was not released into the environment during Sunshine's ownership of the property; (2) that § 403.141(2) (providing that if damage attributable to two or more polluters is divisible, each polluter should be held liable only for the damage he caused) and § 376.308(4) (providing a "third party polluter" defense in action to force cleanup of polluted properties) evince the legislative intent not to impose liability on parties in Sunshine's situation; and (3) that all of the pollution at issue was necessarily attributable to parties other than Sunshine and under such circumstances, "the statute exonerates Sunshine from liability... ."
In accordance with his interpretation of the facts and the law, the hearing officer thereupon recommended that the order for corrective action be modified to place all responsibility for cleanup of the pollution on K & F, with Sunshine to be responsible only for cooperating with the cleanup effort by permitting reasonable access to the property. DER filed exceptions to the hearing officer's conclusions of law, but did not dispute his findings of fact.
In its final order, DER approved and adopted all of the findings of fact set forth in the recommended order, but rejected certain of the hearing officer's conclusions of law. Specifically, DER ruled (1) that the provisions of § 403.141(2) providing for divisibility of liability wherein environmental damage is divisible apply only to liability for damages, and not to liability for cleanup costs; (2) that the third party defense established by § 376.308(4) did not apply to relieve Sunshine of liability for cleanup since the gasoline contamination at issue was not solely the result of acts or omissions of K & F; (3) that as owner of a contaminated property which is continuing to maintain a source of groundwater pollution appellant is "maintaining" a stationary installation which is a source of pollution contrary to § 403.087; and (4) that Sunshine is therefore responsible for abating the pollution emanating from its property. Accordingly, DER ordered both K & F and Sunshine to comply with the order for corrective action and to proceed with the cleanup of the gasoline spill.
We concur with DER's conclusion that our legislature, in enacting Chapters 376 and 403, mandated liberal construction of the statutes to protect the public health, safety, and welfare. It did not make liability *1180 for polluting the environment contingent on a showing of negligence or fault. We also concur in DER's contention that as a state agency charged with interpreting and enforcing Chapters 376 and 403, its interpretation of those statutes should be accorded great weight and that a permissible interpretation of those statutes by DER should be upheld. However, in this case, DER's conclusions of law are based on completely erroneous facts that are contrary to the findings of fact of the hearing officer which DER accepted. DER contends that the third party defense established by § 376.308(4) did not apply to relieve Sunshine for liability for the cleanup since the gasoline contamination at issue was not solely the result of the acts or omissions of K & F, and that as owner of contaminated property which is continuing to constitute a source of groundwater pollution, Sunshine is "maintaining" a stationary installation which is a source of pollution contrary to § 403.087.
The evidence in this case conclusively shows without any contradiction the following facts: (1) that there were three underground tanks on the property purchased by Sunshine but that Sunshine had no knowledge of the conditions of the tanks or that any of the tanks had leaked at anytime in the past; (2) that Sunshine had no knowledge that there had been a discharge of gasoline until its contractor was in the process of removing the tanks in order to construct a new facility; (3) that the three tanks were checked and were found to have three inches of gasoline in the bottom of each tank; (4) that all but one inch of gasoline was pumped out before the tanks were moved; (5) that the tanks were pressure tested and two tanks passed the pressure test but a hole was found in the third tank in one end approximately 30 inches from the bottom of the tank; and (6) that at no time during its ownership of the property did Sunshine ever put gasoline in any of the tanks. Under the above facts, it is impossible that any gasoline was discharged or leaked from the defective storage tank after Sunshine's acquisition of the property and during its ownership. The only hole in the defective tank was approximately 30 inches above the bottom of the tank and the gasoline level in that tank had been reduced to approximately three inches above the bottom prior to Sunshine's acquisition of the property. DER admits that no gasoline was discharged from the tank into the surrounding soil during Sunshine's ownership.
DER contends the defense that the pollution was the result of the acts of a third party is not available to K and F, and therefore it is not available to its successor in title, Sunshine. We disagree. As found by the hearing officer, the defense that the pollution was caused by an act or omission of a third party as provided in § 376.308(4) is applicable to Sunshine under the facts in this case and it is not guilty of any violation of Chapters 376 or 403.
The final order of DER is reversed and the cause is remanded with instructions to enter a final order in accordance with the recommended order of the hearing officer.
REVERSED and REMANDED.
SHIVERS, C.J., and BOOTH, SMITH, JOANOS, WIGGINTON, NIMMONS, ZEHMER, BARFIELD and MINER, JJ., concur.
ERVIN and WENTWORTH, JJ., dissent.
ERVIN, Judge, dissenting.

I.
Given the broad regulatory powers delegated to the Department of Environmental Regulation (Department) concerning the correction and prevention of polluting discharges under Section 376.303, Florida Statutes (1985), I think the issue before us could, in a rather simple and straightforward way, be resolved by deferring to the Department's interpretation of its delegated powers. This court has frequently reiterated the rule that it will defer to any interpretation by an agency that falls within the permissible range of statutory interpretations. See, e.g., Department of Professional Reg., Bd. of Medical Examiners v. Durrani, 455 So.2d 515, 517 (Fla. 1st DCA 1984); Department of Admin. v. Nelson, 424 So.2d 852, 858 (Fla. 1st DCA *1181 1982); State Dep't of Health & Rehab. Servs. v. Framat Realty, Inc., 407 So.2d 238, 241 (Fla. 1st DCA 1981). The Department's interpretation of its responsibilities, in my judgment, appears altogether consistent with the legislative goal of protecting the public from contaminated groundwater. See also Department of Envtl. Reg. v. Goldring, 477 So.2d 532, 534 (Fla. 1985) (Department's construction of its powers under Chapter 403, the Florida Air and Water Pollution Control Act, was consistent with the legislative goal of "[protecting] the air and waters of Florida from pollution and degradation.").
Although I agree with the majority's conclusion that the evidence cannot support a finding "that any gasoline ... leaked from the defective storage tank after Sunshine's acquisition of the property and during its ownership," ante at 1180, I cannot agree that the lack of such evidence necessarily absolves Sunshine from any liability for the unlawful discharge. The majority's opinion earlier states, and the record supports, "that gasoline which had previously leaked from the tank was continuing to seep through the soil and into the water table beneath the site, and posed a potential threat to the water table and water wells located nearby." Ante at 1178. Thus, while competent, substantial evidence undergirds the hearing officer's finding that all of the gasoline had leaked from K & F's defective tank before Sunshine's purchase of the property, the record does not and could not support a finding that there was no discharge of a pollutant, as defined by law, during Sunshine's ownership of the property.[1] On the contrary, there was continued seepage of gasoline into the water table following Sunshine's acquisition.
Nor do I find any lack of evidentiary support in the Department's conclusion that Sunshine was maintaining, without a permit, a stationary installation that was a source of water pollution, notwithstanding the fact that all of the gasoline had leaked from the underground storage tank before Sunshine's acquisition of the property. An "installation" is not limited to a stationary underground storage tank, but includes as well "any structure, equipment, or facility, or appurtenances thereto, or operation which may emit ... water contaminants in quantities prohibited by rules of the department." § 403.031(4), Fla. Stat. (1985) (emphasis added). Because the discharge, or seepage, continued in an area appurtenant to the source of the initial discharge for no less than three months during Sunshine's ownership of the property, the Department could appropriately determine that Sunshine maintained a polluting installation by taking no affirmative steps to abate the continuing discharge. Under the circumstances, I consider that the Department adequately sustained its conclusion that Sunshine violated the permit requirements of Section 403.087, Florida Statutes (1985).
The Department moreover specifically rejected Sunshine's defense that its predecessor, K & F, was solely responsible for the discharge of the contaminant, and determined that both Sunshine and K & F were strictly liable for causing the discharge. In order to decide whether the Department has correctly interpreted the regulatory duties legislatively delegated to it, we should, in this case of first impression, turn to applicable case law from the federal sector. This, I think, is required by the express terms of Section 376.315, Florida Statutes (1985), stating that the provisions of sections 376.30 through 376.315 shall be liberally construed to effect the purposes set forth both under those statutes and the Federal Water Pollution Control Act (FWPCA) (33 U.S.C.A. §§ 1251-1387 (West 1986 & Supp. 1989)), as amended. The established rule in this state is that if a Florida statute is modeled upon a federal law on the same subject, the Florida statute "will take the same construction in the Florida courts as its prototype has been given in the federal courts insofar as such construction is harmonious with the spirit and policy of the Florida legislation on the subject." Pasco County School Bd. v. *1182 Florida Pub. Employees Relations Comm'n, 353 So.2d 108, 116 (Fla. 1st DCA 1977). See also Kidd v. Jacksonville, 97 Fla. 297, 120 So. 556 (1929).
Because Sunshine has defended on the basis that its predecessor in title was solely responsible for the discharge of the polluting gasoline  a defense authorized by section 376.308(4)  an examination of case law in which federal courts have interpreted the corresponding federal statute, section 311(f) of the FWPCA (33 U.S.C.A. § 1321(f)), relating to the third-party defense of persons charged with causing pollution to the nation's navigable waters, is instructive. Federal case law discloses a very strict construction of the defense. For example, federal "[c]ourts have interpreted Section 311 of the Clean Water Act to define a standard of liability without fault... . Moreover, the legislative history is clear that Congress understood judicial interpretations of section 311 to impose strict liability... ." Violet v. Picillo, 648 F. Supp. 1283, 1290 (D.R.I. 1986) (citations omitted).
A discharger can escape liability only if it can be shown that another party's act was the sole cause of the discharge; there can be no contributing conduct, however slight, on the part of the discharger. United States v. Bear Marine Servs., 509 F. Supp. 710, 715 (E.D.La. 1980), vacated and remanded on other grounds, 696 F.2d 1117 (5th Cir.1983). The third-party defense in the federal sector has, moreover, been strictly construed against the party asserting it. See United States v. West of Eng. Ship Owner's Mut. Protection & Indem. Ass'n (Lux.), 872 F.2d 1192 (5th Cir.1989); United States v. LeBeouf Bros. Towing Co., 621 F.2d 787 (5th Cir.1980), cert. denied, 452 U.S. 906, 101 S.Ct. 3031, 69 L.Ed.2d 406 (1981); Burgess v. M/V Tomano, 564 F.2d 964 (1st Cir.1977), cert. denied, 435 U.S. 941, 98 S.Ct. 1520, 55 L.Ed.2d 537 (1978); Reliance Ins. Co. v. United States, 230 Ct.Cl. 390, 677 F.2d 844 (1982). See also Annotation, Liability, Under § 311(f, g) of Federal Water Pollution Control Act (33 USCS § 1321(f, g)), to United States of Owner or Operator of Onshore or Offshore Facility, or Vessel, for Discharge of Oil or Hazardous Substance, 56 A.L.R.Fed. 343 (1982).
In United States v. LeBeouf Bros. Towing Co., the Fifth Circuit was called upon to interpret the third-party defense authorized by the FWPCA, which is couched in language similar to Florida's third-party defense.[2] Specifically, 33 U.S.C.A. § 1321(f)(1) (West 1986) provides:
Except where an owner or operator can prove that a discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether any such act or omission was or was not negligent, or any combination of the foregoing clauses, such owner or operator of any vessel from which oil or a hazardous substance is discharged ... [shall] be liable to the United States Government for the actual costs incurred under subsection (c) ... *1183 for the removal of such oil or substance... .
(Emphasis added.)
In LeBoeuf Bros. Towing Co., an owner of a tanker barge had defended the spillage of crude oil into a navigable stream on the theory that the spill was solely caused by a tugboat crewman who had mistakenly opened the wrong valve while unloading oil from the barge. In rejecting the owner's argument, the Fifth Circuit determined that the defense "must be narrowly interpreted... . A narrow interpretation of the third-party defense would make it consistent with the other section 1321(f)(1) defenses... . The only significant legislative history relating to the third-party defense also suggests that a narrow interpretation is proper...." LeBeouf, 621 F.2d at 789.
The United States Court of Claims in Reliance Ins. Co. v. United States, 230 Ct.Cl. 390, 677 F.2d 844 (1982), placed an interpretation of the third-party defense statute similar to that of the Fifth Circuit. There, Reliance became subrogated to the claim of its insured, Smith-Rice Company, an enterprise engaged in the business of maritime barge and derrick operations. Having paid the costs necessary to clean up an oil spill that had been discharged into an estuary during the insured's dredging operations, Reliance filed an action in the Court of Claims, pursuant to the provisions of Section 311(i) of the FWPCA, authorizing reimbursement from the United States to owners or operators of discharging vessels upon a showing, inter alia, that the discharge was solely caused by "an act or omission of a third party." Id. at 845 n. 1 (quoting from section 1321(i)(1)). The basis of plaintiff's contention was that the discharge was the result of the acts or omissions of former unrelated owners of the property who had left a concealed underground oil deposit on the property. The court rejected this defense, noting that while the existence of the deposited oil may have resulted from the act or omission of a third party, it was Smith-Rice's dredging that caused the oil to discharge into the estuary. Therefore, the acts of Smith-Rice were a contributing cause of the oil spill; thus the spill was not caused solely by the act or omission of a third party. Id. at 849-50.
Although the facts at bar are different, in that there was no active intervention by Sunshine contributing to the discharge at bar, its failure to act, under the circumstances, subjects it to the strict liability provisions of the statute. This conclusion is underscored by the following comments by the Court of Claims in Reliance relating to the third-party defense:
[I]t appears to us that the proper construction to be given to the phrase "caused solely by" can be drawn from the purpose and intent of the statute itself. The legislative history of section 1321 demonstrates Congress' desire for a comprehensive solution to the nation's oil spill problem. After lengthy and extensive discussion, Congress determined that a system of absolute liability with specified limits best protected the public interest. Such a system, it was felt, properly placed the cost for an oil spill on the responsible party, and not on the general public. After deciding on the nature of the liability, Congress then considered the circumstances under which an owner or operator should be exempt from the imposition of such liability. Only in those instances which Congress believed to be completely beyond the control of the owner or operator would they be excused from liability. Any conduct, however slight, on the part of an owner or operator contributing to a spill would negate relief, even though such conduct might have operated in concert with greater third-party conduct to produce the spill. In other words, only where the owner's or operator's conduct was so indirect and insubstantial as to displace him as a causative element of the discharge would he be relieved of responsibility and, correspondingly, financial liability.
Reliance, 677 F.2d at 849 (emphasis added) (footnotes omitted).
Another case, more pertinent to the facts at bar, similarly rejected a plaintiff's defense that the discharge was solely that of a vandal who had trespassed upon its property *1184 and opened a valve attached to an oil storage tank, resulting in an oil spill into a lake. Proctor Wholesale Co. v. United States, 215 Ct.Cl. 1049, 578 F.2d 1388 (1978). The Court of Claims, in rejecting Proctor's third-party defense, stated that the owner, which had purchased the property 40 days before the discharge, had failed to act reasonably to prevent the vandalism, in that there was no fencing around plaintiff's facility, there were no security personnel on duty, there was no external lighting, and, perhaps most importantly, Proctor failed to take even minimal investigative measures to ascertain whether any of the tanks contained oil. Id. 215 Ct.Cl. at 1051, 578 F.2d 1388. Accord Travelers Ins. Co. v. United States, 2 Cl. Ct. 758 (1983); Atlantic Richfield Co. v. United States, 1 Cl. Ct. 261 (1982); City of Pawtucket v. United States, 211 Ct.Cl. 324, 546 F.2d 430 (1976).
The above federal decisions offer strong persuasive authority that the third-party defense is unavailable to Sunshine under the circumstances, because Sunshine should have, with reasonable inquiry, discovered the presence of pollution and could have, among other things, fashioned a contract with the seller providing for indemnification for the costs of pollution cleanup. Sunshine, as the Department's final order[3] points out, is an experienced retail distributor of gasoline which knew the property it was buying contained underground storage tanks that formerly had gasoline in them. Yet, knowing the danger that leaking tanks present, Sunshine nonetheless failed to take immediate steps to determine whether all of the tanks were in fact secure from leaks, and indeed failed or omitted to examine their condition for more than three months after the property's acquisition. In my judgment, the Department appropriately considered that Sunshine's conduct did not conform to the required standard of care[4] in that it failed to act reasonably in abating the continuing discharge of the pollutant, and that the third-party defense was therefore unavailable to Sunshine.
Sunshine also argues that liability based solely upon property ownership cannot be justified. However, in National Wood Preservers, Inc. v. Commonwealth of Pa. Dep't of Envtl. Resources, 489 Pa. 221, 414 A.2d 37, appeal dismissed, 449 U.S. 803, 101 S.Ct. 47, 66 L.Ed.2d 7 (1980), a landowner was held responsible for groundwater contamination that he did not cause. There, the court commented that actions in which landowners have been held responsible for conditions on their land which they did not cause and for which they were not at fault have survived constitutional challenges. Id. 414 A.2d at 45-46 (citing Penn Cent. Transp. Co. v. New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), and Miller v. Schoene, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928)).
Moreover, as previously noted, Sunshine's liability here is based not upon mere ownership, but rather upon its failure as a sophisticated purchaser to investigate the potentiality of pollution on property known to have contained a stored pollutant *1185  turning a blind eye to the facts. Liability for failure to take reasonable steps necessary to apprise oneself of the true state of facts is justified. An instructive case is Miller v. Cudahy Co., 656 F. Supp. 316 (D.Kan. 1987), aff'd in part relevant herein, rev'd in part, 858 F.2d 1449 (10th Cir.1988), cert. denied, ___ U.S. ___, 109 S.Ct. 3265, 106 L.Ed.2d 610 (1989). Cudahy, a subsequent owner of the property, was found liable for salt pollution of groundwater begun in 1908, when the predecessor of American Salt, an intermediate owner, began a salt-production operation. Among other defenses, Cudahy alleged that it was unaware of the state of pollution on the property. The court noted: "[The defendants] made a conscious decision not to investigate the `real facts.' They must now live with that decision." Id. at 331. The court also noted: "[I]t is painfully clear that the defendants, without excuse, made a decision not to investigate the damage to the aquifer." Id. at 333. The court refused to recognize the defendants' ignorance of the actual condition of the property as a defense to the action of adjoining landowners for damages against Cudahy. Although the polluter in Miller had owned the property for some time, while the defendant here had owned it for only a short time before the pollution of the groundwater was discovered, nevertheless, the principle applies with equal force to the instant case: one's deliberate decision not to investigate a harmful, polluting condition will not shield one from liability.

II.
In its opinion, the majority also refers to the fact that the agency found Sunshine liable for maintaining a stationary installation which could reasonably be expected to be a source of water pollution, in contravention of the permit requirement provisions of section 403.087, although Sunshine was not charged with violating this particular statute. If I understand the majority's opinion correctly, it does not reverse the final order of the Department on the basis that Sunshine was not given proper notice of the charge for which it was found liable, but holds instead that the discharge was caused solely by the acts of a third party, and, as a result, Sunshine is exonerated from any liability. Nonetheless, if the majority's opinion was influenced in any respect by the failure of the agency to allege a violation of section 403.087 in its notice of violation, I cannot agree that the Department's failure to reference this statute prejudiced Sunshine from adequately defending itself.
Among other things, the notice stated that "K & F's activities... on property currently owned by respondent Sunshine have resulted in a discharge of refined petroleum products upon the lands and waters of the state." The effect of this allegation was to accuse Sunshine of a violation of Section 376.302, Florida Statutes (1985), prohibiting the discharge of pollutants into or upon any waters of the state or lands in violation of any departmental standard. Section 376.311(2), Florida Statutes (1985), moreover, states that the penalties for a discharge shall include those provided in chapter 403, and Section 403.141(2), Florida Statutes (1985), specifically declares that if two or more persons pollute the waters of the state in violation of the chapter, each violator shall be jointly and severally liable for such damage and for the reasonable costs and expenses incurred in restoring the waters to their former condition, unless the damage is divisible and attributable to a particular violator.
I therefore cannot conceive that Sunshine was in any way prejudiced by the Department's failure to allege specifically that Sunshine was maintaining a polluting stationary installation without a permit, given the general allegations stated. Moreover, despite the lack of reference to the statute in the initial notice of violation, the Department, before the case proceeded to hearing, in response to Sunshine's motion to dismiss, explicitly cited section 403.087.
The rule is generally recognized that an administrative complaint need not comply with the "technical niceties of a pleading filed in a court of law," but need "only be specific enough to inform the accused with reasonable certainty of the nature of the charge." Seminole County Bd. of County *1186 Comm'rs v. Long, 422 So.2d 938, 940 (Fla. 5th DCA 1982), review denied, 431 So.2d 989 (Fla. 1983). See also Hunter v. Department of Professional Reg., 458 So.2d 842, 844 (Fla. 2d DCA 1984). I therefore see no basis on which reversal can be predicated due to a theory of inadequate notice. Moreover, assuming, for the sake of argument, that Sunshine's position is correct its remedy is not outright reversal, but rather reversal and remand with directions that proper notice be given and a new hearing accorded. Cf. Linkous v. Department of Professional Reg., 417 So.2d 802 (Fla. 5th DCA 1982).

III.
Finally, because we are construing Florida's third-party defense for the first time, we should be sensitive to the policy ramifications of our decision. There are important policy reasons  economic efficiency, fairness, and deterrence  that support the imposition of liability here. It is a traditional function of tort law not only to provide compensation for losses, but also to ensure that careless conduct be deterred. The majority's opinion has the effect of rewarding a sophisticated business purchaser for its failure to investigate the true facts of pollution, and thereby provides a signal to such purchasers that they need not inform themselves of the actual condition of property which was known to contain a stored pollutant. In an age in which pollution of the environment is becoming ever more prevalent,[5] and, in particular, when incidents of leaking underground gasoline storage tanks are on the rise, an opinion which places a broad  rather than a narrow  construction upon a discharger's third-party defense may have a potentially devastating effect upon the Department's future efforts to forcefully carry out its statutory duties.
It is true that both K & F and Sunshine were jointly accused with causing the discharge, and that K & F's liability remains unaffected by the majority's opinion.[6] Nevertheless, the potential far-reaching consequences of this decision cannot, in my view, be confined to either the facts or the parties involved in this case. Thus, if in another case an owner is relieved from liability based upon the fact, as here, that gasoline had leaked from a tank only during a predecessor's ownership of the property  although seepage of the pollutant thereafter continued  and additional facts show that the prior owner is no longer able to defray the costs of cleanup, such costs would obviously have to be borne by the public.
Any decision that permits an entity which stores and markets a pollutant to escape liability under such circumstances, thereby shifting that cost to the general public, creates a dysfunctional result, because informed choices will be prevented. A decision regarding the proper place and method for storing petroleum will be forestalled, and choices about which community to live in will be based upon inadequate information about such communities.
There is obviously no fairness in a rule of liability which amounts to a potential spreading of the risk across the community  a traditional role of the insurance industry  without an opportunity to share *1187 directly in the profits of the business, or indirectly in the profit of insuring the business venture. The only benefit is the hoped-for clean water, which the polluter and the nonpolluter will equally share.
But, even assuming that in future cases a party primarily responsible for causing the pollution (such as K & F) is financially able to bear all of the expenses necessary for a cleanup, a rule that excuses the conduct of a less-responsible polluter does nothing to deter further careless or inattentive conduct, nor does it provide incentives to both a seller and a buyer to take prompt measures to investigate the actual condition of property which may be a source of water pollution. Such a result could hardly be expected to further the legislative goal of protecting the public from exposure to contaminated groundwaters.
In enacting their respective Clean Water Acts, both Congress and the Florida Legislature had something far more important in mind than the issue of which entity should bear the costs of a cleanup, or even indeed the vindication of the private rights of those persons in the immediate area whose water supply was contaminated by the unlawful discharge. The legislative bodies' overriding purpose in adopting such legislation was the protection of the public. As explained in United States v. West of Eng. Ship Owner's Mut. Protection & Indem. Ass'n (Lux.), 872 F.2d 1192 (5th Cir.1989), the FWPCA represented a compromise between the House and the Senate. The House Bill, while prohibiting the discharge of oil in navigable waters, imposed civil penalties and cleanup liability only on owners or operators who had willfully or negligently discharged oil. Owners or operators could rebut a prima facie showing of liability by presenting evidence that their actions were not willful or negligent. Id. at 1196-97. The Conference Committee, however, accepted the Senate's approach, creating strict liability subject to the four exceptions listed in section 1321(f), relieving the owners or operators from liability caused by a discharge upon the latter's proof that the discharge was solely caused by (1) an act of God, (2) an act of war, (3) negligence on the part of the United States, or (4) the act or omission of a third party. In adopting the Senate Bill, the Senate Committee Report stated:
The committee determined ... that some form of absolute liability should be imposed... .
... [Marine] [i]nsurance ... has been designed to protect people who either work for, use, own or operate a vessel. Were this the case with oil pollution, the imposition of liability based on negligence would not be questioned. However, the discharge of oil can and usually does affect the general public, and persons and property wholly unrelated to the vessel, who have no control over it.
The public interest, it can be argued, can be completely protected only by absolute and unlimited liability; negligent and limited liability should protect only private interests... .
Under absolute liability with limits, a vessel owner would be absolutely liable regardless of fault, but the injured party would be limited in the amount of the damages which could be collected. This approach avoids the difficult, if not impossible, task of proving negligence or rebutting the case for non-negligence made by the vessel owner. It also places the risk on the responsible party, not on the general public.
Id. at 1197 (quoting S.Rep. No. 351, 91st Cong., 1st Sess. (1969)) (emphasis modified). It is therefore clear from the above comments that the public's interests were the paramount consideration of Congress in its enactment of the 1970 amendments to the FWPCA.
Such interests were also the primary motivating goal behind the enactment of Florida's own Clean Water Act. Consider the following legislative declarations in Section 376.30, Florida Statutes (1985):[7]
(1) The Legislature finds and declares that the preservation of surface and groundwaters is a matter of the highest urgency and priority, and that such use *1188 can only be served effectively by maintaining the quality of inland waters in as close to a pristine condition as possible, taking into account multiple-use accommodations necessary to provide the broadest possible promotion of public and private interests.
(2) The Legislature further finds and declares that:
* * * * * *
(d) Such state interests outweigh any economic burdens imposed by the Legislature upon those engaged in storing pollutants and related activities.

(3) The Legislature intends by the enactment of ss. 376.30-376.315 to exercise the police power of the state by conferring upon the Department of Environmental Regulation the power to:
(a) Deal with the hazards and threats of danger and damage posed by such storage and related activities;
* * * * * *
(4) The Legislature further finds and declares that the preservation of the quality of surface and groundwaters is of prime public interest and concern to the state in promoting its general welfare, preventing disease, promoting health, and providing for the public safety and that the interest of the state in such preservation outweighs any burdens of liability imposed by the Legislature upon those persons engaged in storing pollutants and related activities.

(5) The Legislature further declares that it is the intent of ss. 376.30-376.315 to support and complement applicable provisions of the Federal Water Pollution Control Act, as amended, specifically those provisions relating to the national contingency plan for removal of pollutants.
(Emphasis added.)
In imposing absolute or strict liability upon those persons responsible for discharges of pollutants, both Congress and the Florida Legislature obviously considered that the public's interests were not adequately protected by a fault-based system of liability. No doubt they hoped that the imposition of strict liability, subject to the limited exceptions, would serve the public interest by deterring pollution of both the navigable waters of the nation and the groundwaters of the state. The construction placed upon the statute by the Department promotes this legislative purpose, because it encourages both a would-be seller of a gasoline distributing facility, as well as a prospective purchaser, to take precautionary measures to ensure that the facility is not discharging a pollutant, or, if it is, to take immediate steps to abate further pollution. Such a rule, consistent with the construction placed on the third-party defense in the federal sector, furnishes strong incentives to an owner, who intends to sell a retail gasoline-distribution facility, to provide guarantees to a would-be buyer that the site is pollution-free, and thereby encourages prompt investigation of the site's condition.
The Department's interpretation similarly furnishes a strong caveat to the prospective buyer, advising that if it fails to take prudent action to make certain that the site is not a source of contamination before purchasing it, the buyer may become jointly liable with the seller for any discharge that continues following acquisition. A decision that excuses a purchaser from liability under circumstances such as those existing here does nothing to deter indifferent or careless conduct, and consequently thwarts the legislative goals of preserving the quality of the state's groundwaters and of protecting the public from the danger of consuming contaminated water.

IV.
In summary, the majority's opinion is inconsistent with the purposes and history of our Clean Water Act, inconsistent with cases construing the federal act, and inconsistent with jurisprudential principles of fairness.
Considering the large numbers of discharges caused by underground gasoline storage tanks and the staggering costs necessary to pay for their cleanup, I propose that the following question be certified to the Florida Supreme Court as one of great public importance:
May the third-party defense, as provided in Section 376.308, Florida Statutes *1189 (1985), be applied to absolve an owner or operator of a gasoline-distribution facility from liability, on evidence showing that before its ownership gasoline had previously leaked from an underground storage tank, and although it no longer continued to leak therefrom during the later owner's or operator's control of the facility, it nonetheless continued to discharge into the groundwaters of the state, as defined in Section 376.301, Florida Statutes (1985), by seeping into same while the facility was in the control of that owner or operator?
WENTWORTH, Judge, dissenting.
I would affirm for the reasons expressed by Judge Ervin. The factual basis cited by the majority for the contrary conclusion ("it is impossible that any gasoline was discharged or leaked from the ... tank after Sunshine's acquisition," (e.s.)) is simply irrelevant under the controlling statutory definitions of a proscribed "discharge" or "seepage," and "installation." The latter term is not limited to physical structures but expressly includes "any ... facility ... or operation," (e.s.), which emits groundwater contaminants. Section 403.031(4), Florida Statutes (1985).
Section 376.308(4) limits the third party defense to occurrences which are "solely" the result of "[a]n act or omission of a third party, other than ... one whose act or omission occurs in connection with a contractual relationship existing, directly or indirectly, with the defendant... ." Our attention has not been directed to any provision, either in our law or the Federal Water Pollution Control Act, which defines the phrase "contractual relationship" as it is used in section 376.308(4), Florida Statutes (1985).[8] A conveyance by which Sunshine Jr. Stores, Inc., acquired from K & F the title to the property here in question would appear to me to fall clearly within the generic definition of a relationship based on contract. Black's Law Dictionary (1979). Under such an analysis, the third party defense to liability embodied in section 376.308(4) would not be available to Sunshine under the circumstances of this case even with respect to the original discharge from the tank.
NOTES
[1] Section 376.301(3), Florida Statutes, (1985), defines the term "discharge" as including not only the leaking, but the seeping, of any pollutant which occurs and which affects the groundwaters of the state. "Seep" is defined as, among other things, "to enter or penetrate slowly ... [or] to become diffused or spread." Webster's Third New International Dictionary 2056 (1971).
[2] Section 376.308, Florida Statutes (1985), states:

Liabilities and defenses of facilities.  In any suit instituted by the department under ss. 376.30-376.315, it is not necessary for the department to plead or prove negligence in any form or manner. The department need only plead and prove that the prohibited discharge or other polluting condition has occurred. The only defenses of a person alleged to be responsible for the discharge to any action under ss. 376.30-376.315 are to plead and prove that the occurrence was solely the result of any of the following or any combination of the following:
* * * * * *
(4) An act or omission of a third party, other than an employee or agent of the defendant or other than one whose act or omission occurs in connection with a contractual relationship existing, directly or indirectly, with the defendant, except when the sole contractual arrangement arises from a published tariff and acceptance for carriage by a common carrier by rail, if the defendant establishes by a preponderance of the evidence that:
(a) The defendant exercised due care with respect to the pollutant concerned, taking into consideration the characteristics of such hazardous waste, in light of all relevant facts and circumstances; and
(b) The defendant took precautions against foreseeable acts or omissions of any such third party and against the consequences that could foreseeably result from such acts or omissions.
(Emphasis added.)
[3] The order states in part:

The record clearly reflects that Sunshine knew that the property had been used for gasoline storage and distribution and intended to continue that use after purchase. Gasoline contamination of soil and groundwater is a risk attendant to such a use of property, and a purchaser of such a facility must be on guard against such risk. Sunshine bought the property with the intent to benefit from its use as a gasoline storage facility; with the benefits of such use go the burdens.
The problems posed by leaking underground gasoline storage tanks were well known even in 1984 when Sunshine purchased the property. Sunshine could have taken steps to protect itself from the liability it might assume by buying a contaminated site, such as putting part of the purchase price in escrow to cover possible cleanup costs, conducting a simple assessment to determine if the tanks which were on the property had leaked, or requiring as a contract condition that the seller perform any required cleanup. Sunshine cannot now be heard to complain that the burden of cleanup is being unfairly placed when Sunshine did not take simple precautions to protect itself. Sunshine's failure to exercise good business judgment is not a defense to liability for cleanup.
[4] In Reliance, 677 F.2d at 848, the Court of Claims observed: "With respect to section 1321 th[e] standard of conduct must reflect Congress' strong concern for the protection of the nation's water resources and is, accordingly, very high." (Footnote omitted.)
[5] For example, it has been estimated that 10,000 spills of oil and hazardous substances annually pollute the navigable streams of the United States. 11 Envt'l.L.Rep. (Envtl.L.Inst.) 10140 (July 1981). Furthermore, Section 376.30(2)(b)-(c) Florida Statutes (1985), declares, as a legislative fact, that discharges of stored pollutants, resulting from actions taken by both private and public entities, "have occurred in the past, are occurring now, and present future threats of potentially catastrophic proportions." In fact, as required by the Florida State Underground Petroleum Environmental Response Act, discharges were reported at nearly 10,000 sites in Florida containing underground petroleum storage tanks for the period ending December 31, 1988. Wells, Petroleum Storage Tanks: Noncompliance Will Cost You Money, Fla.B.J., Feb. 1990, at 60.
[6] If liability were also imposed upon Sunshine, it might have the remedy of seeking contribution from K & F for any amount Sunshine is required to pay above and beyond an equal share of the entire cost of cleanup. See Kavanaugh, Liability for Hazardous Waste Pollution under Florida Law: Contribution Rights under F.S. Ch. 403, Fla.Bar.J., Feb. 1988, at 27.
[7] Similar legislative statements are expressed in Section 403.021, Florida Statutes (1985), relating to environmental control.
[8] The "Comprehensive Environmental Response, Compensation and Liability Act of 1980" is a federal hazardous waste cleanup statute with a third-party defense to liability containing language which is precisely parallel to the language of the third party defense embodied in section 376.308(4), Florida Statutes (1985). 42 U.S.C. §§ 9601-9607. This federal statute further defines "contractual relationship" to include:

[L]and contracts, deeds or other instruments, transferring title or possession, unless the real property on which the facility concerned is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility, and one or more of the circumstances described in clause (i), (ii), or (iii) is also established by the defendant by a preponderance of the evidence:
(i) At the time the defendant acquired the facility the defendant did not know and had no reason to know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in or at the facility. (emphasis supplied)
.....
(iii) The defendant acquired the facility by inheritance or bequest.
42 U.S.C. § 9601(35)(A).
This section also provides that in order to establish that a defendant who has purchased the property where the hazardous substance is deposited had no reason to know of the deposit, the defendant must have undertaken "all appropriate inquiry" consistent with customary practice and "any specialized knowledge or experience on the part of the defendant." 42 U.S.C. § 9601 (35)(B). In addition, a court must consider "the obviousness of the presence or likely presence of contamination at the property, and the ability to detect such contamination by appropriate inspection." 42 U.S.C. § 9601(35)(B).