SMITH PROPERTY HOLDINGS, 4411 CONNECTICUT L.L.C., Plaintiff,

v.

UNITED STATES of America, et al., Defendants.

No. 01CV0855(RBW).

United States District Court, District of Columbia.

March 31, 2004.

Scott A. Harvey, Thompson Hine, LLP, Washington, DC, for Plaintiff.

Natalia Tania Sorgente, Scott Jeffrey Jordan, Gertrude Kelly, Washington, DC, for Defendants.

### *MEMORANDUM OPINION*

WALTON, District Judge.

In this lawsuit, plaintiff seeks to recover the costs it incurred and profits it lost pursuant to the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.* (2000), as a result of an oil spill that occurred on property it owned. Currently before the Court are the parties' cross motions for summary judgment. Plaintiff has also filed a motion to strike certain pleadings that have been filed by the defendants. For the reasons set forth below, the Court concludes that the defendants are entitled to summary judgment.

### I. Background

Because the applicability of the Oil Pollution Act to the facts of this case requires an understanding of the Act's statutory scheme, the Court will first provide a brief overview of the pertinent provisions of the Act before providing the factual background which underlies this lawsuit.

### A. The Oil Pollution Act and the Oil Spill Liability Trust Fund

The Oil Pollution Act ("OPA" or the "Act"), was enacted by Congress "in the wake of the Exxon Valdez oil spill to provide a prompt, federally-coordinated response to oil spills in navigable waters of the United States and to compensate innocent victims." *Gatlin Oil Co. v. United States*, 169 F.3d 207, 209 (4th Cir.1999). The OPA is administered by the Coast Guard pursuant to an Executive Order. Memorandum in Support of the United States' Cross–Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment ("Gov.'s Opp'n") at 3 (citing Executive Order 12777 (October 18, 1991)). The Act provides that

each *responsible party* for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines ... is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a) (emphasis added). The Act explicitly defines an "incident" as "any occurrence or series of occurrences

having the same origin, involving one or more vessels, facilities or any combination thereof, resulting in the discharge or substantial threat of discharge of oil[.]" 33 U.S.C. § 2701(14). A "responsible party" is defined in the Act to include a person or persons who owns a vessel, an onshore or offshore facility, a deepwater port, or a pipeline. *Id.* § 2701(32)(A)-(E). As to a vessel, onshore or offshore facility, deepwater port, or pipeline that has been abandoned, "the persons who would have been responsible parties immediately prior to the abandonment of the vessel or facility[,]" are deemed to be the responsible parties. *Id.* § 2701(32)(F).

While a responsible party is strictly liable for any damages resulting from a discharge from its vessel or facility, liability can be avoided if the party can establish a third party defense. A third party defense is described in the Act as follows:

> [I]n any case in which a responsible party establishes that a discharge or threat of a discharge and the resulting removal costs and damages were caused solely by an act or omission or one or more third parties ... (or solely by such an act or omission in combination with an act of God or an act of war), the third party or parties shall be treated as the responsible party or parties for purposes of determining liability under this subchapter.

*Id.* § 2702(d)(A); *see also* 33 U.S.C. § 2703 ("Defenses to liability"). A party that establishes a defense to liability is entitled to be reimbursed for "uncompensated removal costs associated with its removal of a discharge of oil if such payment is consistent with the National Contingency Plan ...." and is for "uncompensated damages." *Id.* § 2712(4). Such reimbursement is paid from the Oil Spill Liability Trust Fund, established by the Act, and which is administered by the United States Coast Guard National Pollution Funds Center ("NPFC" or "Fund"). The Act required the President to establish regulations that would govern the use of the Fund. *Id.* § 2712(e). One of these regulations provides that when seeking recovery of a claim, "[t]he claimant bears the burden of providing all evidence, information, and documentation deemed necessary by the Director[ ] [of the] NPFC, to support the claim." 33 C.F.R. § 136.105.

## B. The Discharge in this Case

Smith Property Holdings 4411 Connecticut LLC ("Smith"), "is a limited liability corporation incorporated under the laws of Delaware with its principal place of business [in] ... Arlington, Virginia." Compl. ¶ 5.[1] Smith is a wholly owned subsidiary of Charles E. Smith Residential Realty, Incorporated ("CES"), which is in the business of "develop[ing] and manag[ing] luxury apartment buildings in Washington, D.C., Maryland, Northern Virginia, and other metropolitan areas across the country." *Id.* ¶ 11. Smith was formed by CES in 1997 for the specific purpose of developing "a new 142–unit apartment complex on a vacant 32,000 square lot at 4411 Connecticut Avenue, N.W., Washington, D.C. (the "Site")." *Id.* Prior to purchasing the Site, Smith had a Phase I Environmental Site Assessment ("ESA") conducted in May 1997 by Schnabel Engineering Associates ("Schnabel"). *Id.* ¶ 12. Schnabel issued a written report to Smith on June 3, 1997, in which Schnabel reported that there was no indication that there were any "recognized environmental conditions" present at the Site, and stating that there were insufficient concerns to warrant a Phase II investigation at that time. *Id.* ¶ 12. However, despite this representation, the ESA indicated that four of eight soil samples "clearly reflect[ed] the presence of oil in the soils." Administrative Record ("A.R."), at

---

1. References to "Compl." are to the original complaint filed by plaintiff on April 18, 2001.

6 (NPFC Final Determination dated October 3, 2002) ("NPFC Final Decision") (footnote omitted).[2] Thereafter, Smith purchased the Site from Kass Realty Company, which had owned the site since 1952, for a purchase price of $3.1 million. A.R. at 6 (NPFC Final Decision). Smith hired Clark Construction Group ("Clark") as its general contractor for the construction of the apartment building. Compl. ¶ 13.

On July 1, 1998, at approximately 11:00 a.m., Clark employees "unearthed one end of a culvert/pipe[ ]" while performing excavation activities at the Site. NPFC Final Decision at 8; see also A.R. at 2110 (NPFC Form, Standard Claim dated October 13, 2000) ("Smith's Third Claim") ("On July 1, 1998, an excavation subcontractor ruptured an abandoned culvert buried beneath the Site."). As a result of the rupturing of the pipe, a "substantial quantity of oil-contaminated water [was released] onto the Site in the vicinity of Soapstone Creek, which is a 'navigable water' under Section 502(7) of the [Clean Water Act], 33 U.S.C. § 1362 and a 'natural resource' under Section 1001 of the OPA, 33 U.S.C. § 2701(20)."[3] A.R. at 2110 (Smith's Third Claim). According to Smith, it "had no reason to know that the abandoned culvert beneath the Site contained an oil discharge." A.R. at 3367 (Supplemental Filing in Support of Claims Against the Oil Spill Liability Trust Fund Arising Out of the Release of Oil at 4411 Connecticut Avenue dated August 9, 2002) ("Smith's Supplemental Claim").[4]

Despite Smith's efforts to expeditiously contain the spill, five gallons of oil were discharged into the Creek. A.R. at 2110 (Smith's Third Claim); A.R. at 8 (NPFC's Final Decision). At approximately 2:31 p.m. on July 1, 1998, Ernest Ralston, a National Park Service Hazmat Officer, notified the National Response Center ("NRC") about the discharge. A.R. at 8 (NPFC's Final Decision). Less than fifteen minutes later, the NRC notified the United States Environmental Protection Agency's ("EPA") Region III Office about the spill. Id. An EPA Federal On–Scene Coordinator ("FOSC") visited the Site on July 6, 1998, at which time she received a copy of Smith's Emergency Petroleum Contaminated Soil and Water Recovery Plan, which had been prepared for Smith by Environmental Consultants and Contractors, Inc. ("ECC"). Id. On July 10, 1998, the EPA issued an Emergency Removal/Response Administrative Order pursuant to § 311(c) of the Clean Water Act. Plaintiff's Motion for Summary Judgment ("Smith's Mot."), Ex. G (Emergency Removal/Response Administrative Order Under Section 311(c) of the Clean Water Act, dated July 10, 1998).[5] The EPA's Admin-

2. Citations to the pages of the administrative record are to the page numbers stamped on the pages by the defendants.

3. This formed the basis for the third claim of Smith's original administrative claim.

4. This supplemental claim was the claim Smith filed after the Court granted the parties' motion for a voluntary remand.

5. The defendants' citation in its memorandum of law in support of its motion for summary judgment cites to pages 2123–2128 of the administrative record in referencing this document; however, the copy of the Administrative Record provided to the Court does not contain pages 2122–3160. In other words, after page 2121, the next page in the administrative record provided to the Court is 3161. To the extent there were other documents missing from the administrative record, the Court has referred to plaintiff's exhibits submitted with its motion for summary judgment, as they have provided copies of the missing documents that were part of the administrative record when the agency made its decision. However, as discussed infra at 18, the Court has not considered those documents submitted by plaintiff that were not before the agency at the time it made its decision.

istrative Order required Smith to, among other things,

1. Continue containment and recovery efforts on site on a continual basis. . . .

2. Continue method/measures to prevent any run-off and/or seepage containing oil from discharging or threatening to discharge onto the adjoining shoreline or into the Soapstone Creek.

3. Maintain boom [devices] at two locations. . . .

4. Dispose of and/or otherwise handle all recovered oil in an environmentally appropriate manner . . .

5. Remove and properly dispose of and/or treat all materials contaminated with oil . . . . [and]

6. Transport all oil contaminated materials designated for off-site disposal to an approved disposal facility. . . .

*Id.* at 5. In addition, Smith was instructed to "immediately, and every two (2) calendar days thereafter . . . submit progress reports for each preceding two (2) day period to the [On–Scene Coordinator]. . . ." *Id.* The EPA Order also indicated that Smith had to continue performance of all response actions until the EPA provided Smith with a notice of completion. *Id.* Smith received the notice of completion on October 25, 1999, wherein the EPA advised Smith that it had "demonstrated to the satisfaction of the EPA that all requirements relating to the performance of the response actions specified in . . . the . . . Order have been completed." Smith's Mot., Ex. I (Letter to Mr. Richard Smith from Deborah Carlson, On–Scene Coordinator, dated October 25, 1999). In total, Smith expended $772,017.15 to comply with the terms of the EPA Order and

suffered $1,175,416.00 in lost profits as a result of "oil-related construction delays." A.R. at 3365 (Smith's Supplemental Claim).[6]

## C. Smith's Claims

On February 2, 1999, Smith submitted a reimbursement claim to the NPFC for $525,174.22. A.R. at 283 (Oil Spill Liability Trust Fund Reimbursement Claim dated February 2, 1999) ("First Claim"). A further claim was submitted on August 11, 1999, seeking an additional $259,749.88. A.R. at 767 (Oil Spill Liability Trust Fund Reimbursement Claim # 2 dated August 11, 1999) ("Second Claim"). The Coast Guard considered these two claims, which totaled $784,924.10, and on May 8, 2000, it sent Smith a settlement offer, which offered to only reimburse Smith $192,084.72. A.R. at 31 (Letter to Smith Property Holdings from J.A. Abramson, Claims Manager, Coast Guard NPFC, dated May 8, 2000). The Coast Guard's letter of settlement indicated that it deemed only one of the five categories of recovery asserted by Smith to be compensable, namely, the costs incurred to clean "[o]il in, around, and leaking from the culvert, which discharged into and posed a substantial threat to continue to discharge into Soapstone Creek." *Id.* The Coast Guard concluded that reimbursement was appropriate for costs associated with this clean-up based on information it had received from Smith indicating that Smith was not aware that "the culvert held a mixture of oil and water. . . ." *Id.* Pursuant to the terms of the letter, Smith was informed that if the Coast Guard did not receive "the signed original Acceptance/Release Form within

**6.** In addition to complying with the terms of the EPA's Order, Smith was required to perform clean-up work by the District of Columbia. *See* A.R. at 1572–1573 (Letter to Mr. Robert Sudol, Charles E. Smith Residential Realty Ltd. from Theodore J. Gordon, Deputy Director of the District of Columbia Health Environmental Health Administration, undated). Although this work was related to the spill, it was not compensable because it was not a part of the FOSC's Administrative Order. A.R. at 24.

60 days of the date of this letter, [the] offer [would be] void." *Id.* at 32. In a letter dated May 18, 2000, Smith rejected the Coast Guard's offer, stating that it was "disappointed in the amount ...." and stating its intention to "prepare a response" that would "hopefully ... result in an evaluation that will foster a fair settlement." *Id.* at 56 (Letter to J.A. Abramson from Darrell Hall, Vice President and Controller, Charles E. Smith Realty Companies dated May 18, 2000). Smith also stated its intention to submit two additional claims, "one for additional costs not previously submitted and one for lost profits." *Id.*

Smith filed another Standard Claim form on October 13, 2000, with the Coast Guard that included claims for lost profits totaling $1,175,416, and sought reconsideration of the Coast's Guard's prior denial of the bulk of the expenses for which Smith sought reimbursement. A.R. at 2104 (Standard Claim dated October 13, 2000) (Smith's Third Claim). By April 18, 2001, the Coast Guard had not responded to Smith's most recent submission and, pursuant to applicable regulations, Smith treated the Coast Guard's lack of response as a final denial of the reconsideration request. *See* 33 C.F.R. § 136.115(d) (Coast Guard has 90 days to review and issue decision regarding claims for reconsideration). Smith filed the instant lawsuit in this Court on April 18, 2001.

### D. Prior Proceedings Before This Court and the NPFC's Final Determination

On September 14, 2001, the defendants filed a motion to dismiss Smith's claims, which was granted in part and denied in part by the Court on May 20, 2002. Thereafter, the parties submitted and the Court approved an Order Granting Voluntary Remand on June 11, 2002. This Order was designed to permit Smith to review the administrative record and to submit a supplemented written position to the Coast Guard regarding its entitlement to reimbursement. Order filed June 11, 2002 ("Remand Order"). The Order also required the Coast Guard to issue a decision regarding Smith's claim within 120 days after the issuance of the Order and, if the Coast Guard determined that Smith was entitled to compensation, to issue a further decision stating the precise amount Smith was entitled to recover. *Id.* On the other hand, if the Coast Guard determined that Smith was not entitled to compensation, the Order permitted Smith to file an amended complaint seeking review of that administrative decision. Smith submitted its supplemental claim to the NPFC on August 9, 2002. A.R. at 3364 (Smith's Supplemental Claim).

In a letter dated October 3, 2002, the NPFC informed Smith that its claims were being denied. A.R. at 1 (Letter to Smith Property Holdings, 4411 Connecticut LLC from Linda Burdette, Chief, Claims Division, NPFC, dated October 3, 2002). The NPFC considered Smith's theory for why it was entitled to reimbursement, which the NPFC termed the "conduit theory," and rejected it. Specifically, Smith argued that "the culvert was an extension of the navigable waterway, not an OPA facility[,]" and that the only evidence in the record pointed to the University of the District of Columbia ("UDC")[7] as the source of the oil. A.R. at 17. Because, according to Smith's theory, the "culvert is not an OPA

---

7. In January, 1997, "UDC experienced a spill of # 2 fuel oil from leading supply and return lines connected to their underground storage tanks." A.R. at 13 (NPFC Final Decision). This spill entered a nearby storm drain that emptied into Soapstone Creek, which is adjacent to the Smith property. *Id.* "UDC is located across Connecticut Avenue, southwest from the Smith site." *Id.*

facility, Smith [could] not be responsible under the OPA, and ... even if the culvert is an OPA facility, Smith is not the responsible party because the culvert was abandoned." *Id.* at 17–18. Commenting on Smith's theory, the NPFC determined that to prevail, Smith would have to "establish that the oil discharged at the culvert originated offsite, that it traveled through the culvert and that the oil did not come from [Smith's] own property." *Id.* at 18. The NPFC determined that Smith did not establish that these events occurred because the evidence showed "that the oil discharged at the culvert was not the same oil as that [previously] discharged from the UDC tanks in January 1997." *Id.* at 18–19. Furthermore, Smith's environmental contractor had been unable to "identify a pathway for the UDC oil to reach the culvert." *Id.* at 19. Next, the NPFC concluded that Smith had not demonstrated "that the oil in fact traveled through the culvert and ... did not originate on [Smith's] own property." *Id.* at 20. On this point, the NPFC noted that Smith had "present[ed] no evidence to support th[e] theory[ ]" that oil had originated elsewhere and traveled to the culvert. *Id.* Rather, according to the NPFC, the evidence showed that "Clark workers observed that the culvert was dry and oil was seeping into the culvert from contaminated soil on Smith's property." *Id.* Based on this evidence, the NPFC concluded that it was "more likely that at some earlier point in time, oil from the Smith property migrated to the area around the culvert, rather than entering the property through the culvert from offsite." *Id.*

The NPFC also rejected Smith's remaining arguments in support of its claim for recovery. First, the NPFC rejected Smith's argument that the Coast Guard's failure to designate a source of the oil spill pursuant to 33 U.S.C. § 2714(a), established that Smith was not a responsible party, noting that "[f]ailure to designate a

source and its owner or operator does not mean that there is no responsible party." *Id.* at 22. The purpose of the designation, NPFC stated, "is to notify potential claimants of the availability of the claims process, not to notify the responsible party of its OPA liabilities." *Id.* The NPFC also concluded that the Coast Guard's prior offer of settlement to Smith did not establish that Smith was not a responsible party because, notably, the offer of reimbursement only pertained to Smith's costs incurred as a result of the discharge of oil at the culvert[,] and it was based solely "on Smith's representation that the oil at the culvert originated offsite and migrated onto the Smith property via the culvert." *Id.* at 24. Finally, the NPFC stated that even assuming Smith was entitled to reimbursement for removal costs, the only costs it would be entitled to collect would be those associated with the discharge of oil from the culvert, not all of the costs Smith incurred cleaning oil from other parts of the property. *Id.* at 25.

In conclusion, based on the evidence it had before it, the NPFC made the following findings:

> While Smith attempts to establish entitlement on a conduit theory, there is more convincing evidence in the administrative record: (1) that the oil did not come from UDC; (2) that the oil came from the Smith property; (3) that the property was contaminated with oil when Smith purchased it; (4) that Smith knew or should have known that oil was present on the property; (5) that the discharge from the culvert was consistent with information known about the property when Smith purchased it in 1998; (6) that Smith is the responsible party, and (7) that the actions of Smith's contractors caused the discharge.

A.R. at 3 (NPFC's Final Decision). On December 3, 2002, Smith filed its amended complaint in this Court.

## E. The Parties' Summary Judgment Arguments

The parties arguments in support of their summary judgment motions are relatively straight-forward. Smith argues that the NPFC's decision is arbitrary and capricious because it violates the intent of the OPA and is contrary to the evidence. Smith opines that the purpose of the OPA is to reimburse parties like Smith who clean-up a "mystery oil spill" that was caused by an unknown source. Memorandum of Law in Support of Motion for Summary Judgment ("Smith's Mem.") at 2.[8] Smith contends that it is entitled to reimbursement from the Fund as it is not an OPA "responsible party because it does not own or operate the OPA facility that discharged the oil." *Id.* at 14. According to Smith, the OPA facility responsible for

the discharge is unknown. *Id.* Smith further argues that "[t]he abandoned culvert was a navigable water in its own right because it was part of a storm drain system." *Id.* at 16. Using this logic, Smith argues that the OPA responsible party is the party "who released the oil into the storm drain." *Id.* Smith notes that the Coast Guard did not designate the source of the discharge as envisioned by the statute, as further support for its contention that Smith could not be the source of the discharge and is therefore entitled to recover from the Fund. *Id.* at 17. Smith argues that because it complied fully with the FOSC's clean-up order, "[t]he Fund is supposed to pay Smith." *Id.* at 28.

In opposition, the government contends that the NPFC's final decision is supported by the administrative record and is not arbitrary and capricious. The government argues that the NPFC's conclusion that Smith is a "responsible party" as de-

8. The Court feels compelled to comment on part of plaintiff's counsel's litigation tactics, which the Court can term as nothing other than petty name-calling, hollow claims of bad faith, and mean-spirited invectives. Throughout its pleadings, plaintiff's counsel makes personal attacks against the government, stating, for example, that the government has engaged Smith in lengthy litigation for the purpose of exhausting Smith's resources, Smith's Mem. at 9, and insulting the qualitative nature of the Coast's Guard's decision by stating that "[e]ven if the Coast Guard relies on misguided summer interns to prepare its decisions, upper management should weed out such glaring errors during the review process[,]"; *id.* at 24. Perhaps the worst, or maybe best example of plaintiff's insulting tactics is found on page 19 of its reply brief where it undertakes to list various "DOJ Irrational Statement[s]" and then provides "Smith['s] Clarification" to each statement. Reply in Further Support of Plaintiff's Motion for Summary Judgment ("Smith Reply") at 19. One of the most derogatory comments being: "*Any child* should know that refined oil cannot be located anywhere unless it is discharged from some sort of tank or other

device used for a purpose involving oil, i.e., an OPA Facility." *Id.* (emphasis added). Or consider where plaintiff compares the federal government's perception that it has acted properly in this case to that of a criminal who does not believe his criminal behavior is wrong. *See id.* at 21–22 ("A criminal who believes there is nothing wrong with robbing banks will continue to rob banks. Likewise, a Federal Trustee who believes there is nothing wrong with misstating the facts and the law will continue to misstate the facts and the law."). The Court commends government counsel on not taking opposing counsel's bait and responding in a like manner. Plaintiff's counsel's tactics only diminish the civility that should exist between members of the Bar and in this judge's opinion are unprofessional and did nothing to strengthen his client's position. Surely counsel could have taken a different approach and the Court encourages counsel to do so in the future. While Rambo tactics may sell tickets at the box office, they do nothing to advance a lawyer's client's cause, which must also take precedent over counsel's need to vent his personal anger and frustrations because events have occurred not to his liking.

fined by the OPA is supported by the evidence. Gov.'s Opp'n at 13. Concluding that Smith was a responsible party, the government posits that the NPFC also rationally determined that Smith had no defense to liability. *Id.* at 18–19. While the government acknowledges that the NPFC's decision implicitly assumed that the culvert qualified as an OPA facility, this assumption was made "[b]ecause Smith ... would not be entitled to recover from the Trust Fund regardless of whether the Smith ... site or the culvert on it were OPA 'facilities,' [therefore,] the Coast Guard did not take a position on whether they were." *Id.* at 2; *see also id.* at 23 ("If, as Smith ... argues, the culvert that discharged the oil is not an OPA facility, then there was no OPA incident."). The government rejects Smith's argument that the relevant discharge was the discharge of oil into the culvert by an unknown party; rather, the government contends, the relevant discharge was the discharge of oil from the culvert, which was caused by Smith's contractor's excavation activities. *Id.* at 19.

## II. Analysis

### A. Smith's Motion to Strike

Smith has filed a motion to strike the government's motion for summary judgment because of the government's failure to submit a proper statement of material facts not in dispute. Plaintiff's Motion to Strike ("Smith Mot. to Strike") at 1. Smith also seeks to strike the government's statement of facts in opposition to Smith's statement of facts because the government allegedly failed to "rebut Smith's submission with any citations to the record." *Id.* In opposition, the government states that its statement of material facts is located within its memorandum in support of its motion for summary judgment, a position Smith insists is inconsistent with a prior position the government took, and argues that it has submitted a sufficient opposi-

tion to Smith's statement of facts. United States' Opposition to Plaintiff's Motion to Strike at 2.

Smith argues that denial of the government's motion is mandated by this Court's local rules and its own general order for civil cases, as the Court states in its general order that motions not complying with LCvR 7 will be denied *sua sponte.* The Court has to agree with plaintiff that the defendants' statement of material facts not in dispute submitted in support of its motion for summary judgment is wholly inadequate. The government argues that its statement of facts should be deemed as a recitation of facts contained in its memorandum in support of its motion for summary judgment. However, the government's recitation of the facts in this case, which is devoid of any indication of which facts are actually material, is not sufficient. For example, in *Robertson v. American Airlines, Inc.,* 239 F.Supp.2d 5, 9 (D.D.C. 2002), the Court struck the defendants' motion for summary judgment due to the defendant's failure to submit a proper statement of material facts. There, the defendants' statement of material facts not in dispute "direct[ed] the court to the body of the defendants' argument and the references contained therein...." *Id.* at 8. The Circuit Court held that defendants' statement failed "to assist the court in isolating the material facts, distinguishing disputed from undisputed facts, and identifying the pertinent parts of the record." *Id.* at 9 (citing *Burke,* 286 F.3d at 518). The government's general recitation of the facts here similarly does nothing to assist the Court in determining what material facts the government considers undisputed.

However, the Court cannot agree with plaintiff that the government's statement of facts in opposition to plaintiff's statement of material facts is completely inadequate. While not a model of what an

opposing statement should be, the government's opposing statement of facts does identify by paragraph number the Smith statement it is seeking to rebut and indicates why the statement should not be accepted as true. While in many instances the government fails to provide precise language supporting its claim, and reiterates the generic statement that "the Administrative Record speaks for itself[,]" the Court nonetheless fails to find the counter-statement of facts wholly inadequate. *Cf. Securities & Exchange Comm'n v. Banner Fund Int'l,* 211 F.3d 602, 616 (D.C.Cir.2000) (upholding the district court's grant of summary judgment where the defendant "filed a response and an affidavit neither of which pointed to specific parts of the record controverting the [plaintiff's] lengthy statement of undisputed facts.").

The Court will now attempt to fashion a just remedy in light of the government's failure to submit a proper statement of material facts that are not in dispute. Although plaintiff urges the Court to grant plaintiff's motion for summary judgment as the sanction, this result is not justified by the circumstances. The Circuit Court has "long recognized that the district court does not abuse its discretion by declining to invoke the requirements of the local rule on a motion for summary judgment." *Burke v. Gould,* 286 F.3d 513, 518 (D.C.Cir.2002). More importantly, Federal Rule of Civil Procedure 56 requires the Court "to consider the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' in determining whether 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* at 519–520 (quoting Fed.R.Civ.P. 56(c)) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Notably, because this case is brought pursuant to the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2000), in determining whether the agency has violated the APA, the Court must "review the whole record or those parts of it cited by a party...." 5 U.S.C. § 706. This obligation makes plaintiff's suggestion that the Court summarily grant its motion, without reviewing the administrative record for itself, even more inappropriate. Furthermore, it is clear that plaintiff has not demonstrated that it was prejudiced in its ability to respond to the government's motion, as reflected by its reply submitted in support of its motion for summary judgment and its opposition to the government's motion prior to filing its motion to strike. In fact, the Court finds it remarkable that plaintiff complains that it has been prejudiced by the government's short-comings, as plaintiff has been afforded the opportunity to file a sur-reply to the government's reply and did not complain at that time about its inability to adequately respond to the government's arguments. However, because of the government's complete failure to submit a proper statement of material facts as to which there is no genuine issue, the Court concludes that the government's motion for summary judgment will be denied without prejudice. *See Robertson,* 239 F.Supp.2d at 9 (Court "decline[d] to adopt the plaintiff's suggestion of striking the [defendants' statement of material facts not in dispute] and denying the defendants['] summary judgment motion[ ], but rather, struck the defendants' motion for summary judgment and permitted the defendants to re-file a motion that complies with the letter and spirit of the rule...."). Accordingly, the Court will construe the government's cross-motion for summary judgment as its opposition to the plaintiff's motion and will strike the government's reply in further support of its motion for summary judgment.

## B. Standard of Review

Plaintiff seeks review of the NPFC's final decision pursuant to the APA. The APA permits the Court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706. Thus, in reviewing the actions of the defendants, the first inquiry the Court must make is "whether the [NPFC] acted within the scope of its authority." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citation omitted). This inquiry also involves a "determination of whether on the facts the . . . decision can reasonably be said to be within [the] range [of the NPFC's authority]." *Id.* After determining whether or not the NPFC acted within the scope of its authority, the Court must then decide, pursuant to 5 U.S.C. § 706(2)(A), whether "the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)); *MD Pharm., Inc. v. DEA*, 133 F.3d 8, 16 (D.C.Cir.1998) (same). In reaching its conclusion regarding this second question, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416, 91 S.Ct. 814 (citation omitted). Finally, the Court must determine whether "the [agency's] action followed the necessary procedural requirements." *Id.* at 417, 91 S.Ct. 814.

Although the Court must make a detailed inquiry into the facts and circumstances underlying the NPFC's actions, "the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* However, the Court must ensure that "[t]he agency [has] articu-late[d] a 'rational connection between the facts found and the choice made.'" *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974) (citation omitted). Therefore, as the District of Columbia Circuit has clearly held, "where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [this Court] must undo its action." *Petroleum Communications, Inc. v. F.C.C.*, 22 F.3d 1164, 1172 (D.C.Cir.1994) (citation omitted). Summary judgment should be granted where there exists "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

As a preliminary matter, the Court notes that plaintiff has submitted its own set of exhibits with its motion for summary judgment. The general rule is that "the focal point for judicial review [, in cases governed by the APA,] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973); *see also Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. 814; 5 U.S.C. § 706 (In determining whether the agency has violated the APA, the Court must "review the whole [administrative] record [that was before the agency] or those parts of it cited by a party . . . ."). Thus, to the extent plaintiff has submitted documents that are outside the administrative record that was before NPFC, the Court has not considered such documents in arriving at its final decision in this opinion.

## C. Was the NPFC's Decision Arbitrary and Capricious?

Smith claims that the NPFC's October 3, 2002, decision was arbitrary and capri-

cious because the facts do not support the NPFC's conclusion that Smith was an OPA responsible party and therefore not entitled to reimbursement from the Fund. Smith's Mem. at 22–32. Smith also argues that there is evidence to support a finding that the agency has acted in bad faith. *Id.* at 26. The Court will consider each of Smith's challenges separately.

### 1. Whether the Evidence Supports a Finding that Smith is an OPA Responsible Party

The first, and an essential, finding that Smith challenges is the NPFC's conclusion that Smith is a responsible party pursuant to the OPA. In reaching this conclusion, the NPFC relied on what it termed the "conduit theory," which was merely a term assigned to what it construed as Smith's theory of recovery, and concluded that Smith had failed to satisfy the elements of that theory. A.R. at 17 (NPFC Final Decision). Smith contends that neither the "law or facts supports [the Coast Guard's] position" that Smith is a responsible party and thus this conclusion is "utterly disconnected from reality." Smith's Mem. at 18. Smith contends that "[i]t is beyond dispute that the OPA Facility that discharged the oil is *unknown.*" *Id.* The Court cannot agree.

The NPFC assumed for the purposes of its analysis that the culvert could be deemed an OPA Facility. Smith argues that "[t]he NPFC's *assumption* conveniently ignores the fact that the Site does not meet the OPA *definition* of 'Facility' . . . ." Smith's Reply in Further Support of Motion for Summary Judgment ("Smith Reply") at 11. The NPFC's decision addressed Smith's argument, stating that it did

> not support Smith's assertion that it is entitled to reimbursement from the Fund. Arguably, if a culvert is not an OPA facility, then a discharge from that

culvert would not constitute an OPA incident. If there is no OPA incident, the Fund is not available to reimburse Smith . . . .

A.R. at 22–23. The Court finds nothing illogical in the NPFC's reasoning. As discussed above, the NPFC rejected Smith's argument that the discharge of significance was the discharge that resulted in the release of oil into the culvert. Specifically, the decision stated "Smith offers a theory that the oil traveled through the culvert from offsite, yet it presents no evidence to support this theory." A.R. at 20. Thus, in order to afford Smith any relief, NPFC *assumed* the culvert would qualify as an OPA Facility. Had it not, Smith would have no basis for recovery. In addition, to further buttress its decision, the NPFC pointed to the fact that

> on July 15, 1998, while inside the culvert, workers observed that the culvert was dry and oil was seeping into the culvert from contaminated soil on Smith's property. Thus, it is more likely that at some earlier point in time, oil from the Smith property migrated to the area around the culvert, rather than entering the property through the culvert from offsite.

*Id.* In light of this evidence, the NPFC was justified in rejecting Smith's argument that "[t]he abandoned culvert was a navigable water in its own right . . . ." and therefore, the relevant release of oil was the release of oil into the culvert. Rather, the NPFC justifiably concluded that the release of oil that threatened a navigable water was the release of oil from the culvert, assuming the culvert was an OPA Facility, and that the release was caused by Smith's contractor's excavation activities. A.R. at 22.

Smith also repeatedly argued that the culvert was abandoned, a contention the NPFC rejected. The NPFC stated that

Smith failed to "provide[ ] evidence establishing that the culvert was abandoned[,]" and even if it had provided such evidence, the fact that the culvert was abandoned "is irrelevant because the evidence shows that the oil in the culvert came from Smith's own property and did not migrate to the property through the culvert." A.R. at 21. The Court does not find the NPFC's reasoning irrational. Furthermore, Smith's argument misconstrues the OPA's broad definition of responsible party. The breath of the definition is illustrated by the fact that the "OPA does not limit the number of responsible parties." *United States v. Bois D'Arc Operating Corp.,* No. Civ.A. 98–157, 1999 WL 130635, at *3 (E.D.La. Mar. 10, 1999). Thus, in *Bois D'Arc*, the Court held that the defendant was a responsible party despite the fact that the party argued that the well responsible for the oil leak had been abandoned. *Id.* While there the Court had concluded that the "well and tank battery platform that caused the discharges [were] offshore facilities within the meaning of" the statute ...." the Court stated that "[t]he legislative history of the OPA is consistent with and comports with a broad definition of responsible party, even for an abandoned facility." *Id.* at *4. Accordingly, the fact that there was possibly another responsible party did not preclude the defendant's liability in *Bois D'Arc* because "Congress made certain that more than one entity could be held accountable for the costs of pollution stemming from oil discharges." *Id.* at *3. Similarly, in this case, accepting Smith's theory that the culvert was abandoned does not preclude a finding that Smith is a responsible party. *Id.* at *4 ("The legislative history of OPA is consistent with and comports with a broad definition of responsible party, even for an abandoned facility."); *see also Reliance Ins. Co. v. United States,* 230 Ct.Cl. 390, 677 F.2d 844, 847, 849 (Cl.Ct.1982) (rejecting plaintiff's argument that, pursuant to the Clean Water Act's ("CWA") defense to liability, owner of facility was "not a cause of a spill if committed without fault[,]" in light of the fact that the owner alleged the prior owner of the property was responsible for releasing oil into the land. The Court held that where the owner's dredging activities were the cause of the discharge of oil into a navigable water, "this dredging was a significant element in the causal chain leading to the ultimate spill, since without this direct intervention, it is reasonable to assume that the deposit of oil eventually dislodged would have remained undisturbed.").[9]

Smith further argues that it is "scientifically impossible" that the oil came from Smith's property and therefore it cannot be a responsible party. Smith Mem. at 21. Smith posits that

9. Plaintiff contends that the *Reliance* case is not relevant here because the *Reliance* Court "addressed whether the owner of oil-contaminated property that met the broad CWA definition of 'facility' proved the CWA third party defense in an action against the United States pursuant to 33 U.S.C. § 1321(i)(1) ... [and][t]he broad CWA definition of 'facility' has no bearing on Smith's OPA claims, which turn on the narrow definition of 'facility.' " Smith's Mem. at 25. However, the Court, like the NPFC, does not rely on the *Reliance* decision concerning the definition of facility, which was not the main issue before that Court. Rather, similar to the situation here, the plaintiff in *Reliance* sought recovery for clean-up costs, arguing that it was not responsible for the discharge although the discharge was directly caused by the acts of its dredging activities. This is similar to Smith's claims that it is not responsible for the discharge at issue here despite the fact that the oil did not begin to discharge from the culvert until after Smith's contractor started its excavation activities. Due to this similarity, the Court finds the *Reliance* decision useful, despite its concern with a different, but analogous, statutory provision.

[j]ust as maggots cannot spontaneously generate from decaying meat, refined oil cannot magically 'come from' or 'originate on' a piece of real estate (or within and around an abandoned storm culvert beneath a piece of real estate). At some point, the oil at the Site was discharged from a tank, container or another OPA Facility. The identity and location of that OPA Facility are unknown. The Fund is therefore supposed to pay Smith for cleaning up a mystery spill. *Id.* In its decision, the NPFC noted that Smith did not "have to establish where offsite the oil originated prior to entering the culvert." A.R. at 20. However, it concluded that Smith did have to demonstrate that the "oil in fact traveled through the culvert and that it did not originate on [Smith's] own property." *Id.* The NPFC reasoned that Smith was unable to prove this fact because there was *no* evidence in the record that the oil originated elsewhere. On this point, the NPFC rejected Smith's suggestion that the oil originated from UDC as testing demonstrated "that the oil sample taken at the culvert was at least ten years old and probably as old as 20 years [while] [ ] the UDC oil was much younger." A.R. at 19. Furthermore, Smith's contractor "could not identify a pathway for the UDC oil to [have] reached the culvert." *Id.* In the NPFC's view, the oil that was present in the Site soil was "conceivabl[y] . . . deposited on the site at

some earlier point in time and it migrated slowly down gradient to the culvert area." *Id.* at 21. While there is no concrete evidence establishing how or when the oil was deposited, there is evidence in the record that there was oil present in the Site soil that was at least 10 years old. On the other hand, there is no evidence to support Smith's theory that there was a discharge of oil from an outside facility into the culvert, and there is no reason to conclude that the discharge into the culvert should be deemed the relevant discharge in this case. To put it simply, if in fact there was a discharge from an unknown facility into the culvert, that discharge has no relevance to the discharge from the culvert, which threatened Soapstone Creek, and which was caused as a result of Smith contractor's activities.[10]

◼ Smith also posits that the NPFC decision is erroneous because Smith is clearly entitled to compensation as a result of complying with the FOSC's clean-up order. Smith's Mem. at 12–14. However, Smith fails to justify how mere compliance with the FOSC's order establishes that it is entitled to recovery from the Fund. There is nothing in the Act that predicates reimbursement on a finding that a responsible party has complied with the FOSC's order. Rather, a responsible party is only entitled to reimbursement if it can establish that it "is entitled to a defense of

---

10. There was also additional evidence in the record that supports the conclusion that the oil was located in the Site soil and thereafter collected in the culvert. The NPFC pointed to the fact that the environmental assessment performed by Schnabel revealed the presence of oil in the Site's soil prior to Smith's purchase of the Site. A.R. at 5–6. Smith argues that the NPFC's *"post-hoc conclusion"* is *"irrelevant"* because, as Smith does not consider itself a responsible party, it had no duty to comply with the "due care" provisions of the OPA third party defense, and, even assuming Smith is a responsible party, "second guess-

ing Schnabel's raw data with the benefit of hindsight does not speak to Smith's standard of care." Smith's Reply at 18. However, none of Smith's arguments belies the NPFC's determination that there was oil detected in the soil at the time Smith purchased the Site. Furthermore, the fact that Schnabel stated that none of the concerns raised in the Phase I assessment warranted a Phase II assessment does not negate the findings in the report that several samples revealed the presence of oil in the soil, nor does this fact merit a finding that Smith was not aware of the presence of oil on the Site.

liability under [§ ] 2703 ...." or that it is "entitled to a limitation of liability under [§ ] 2704...." 33 U.S.C. § 2708.

■ Smith next argues that the NPFC's conclusion directly contradicts its prior determination that Smith was entitled to reimbursement, as evidenced by the NPFC's settlement offer. Smith offers no authority for the proposition that a settlement offer proves that a party is entitled to reimbursement. To the contrary, settlement offers are not evidence of a defendant's liability. *Garcia v. Llerena*, 599 A.2d 1138, 1141–42 (D.C.1991) ("[O]ffers of settlement and compromise traditionally have not been admissible to prove liability or damages ... [because] such offers are of questionable relevance, since they readily may be 'construed as a desire for peace rather than an admission of weakness of position[,]' ... [settlement offers] ... further[ ] the policy of promoting the settlement of disputes ....") (citations omitted); *see also* Fed.R.Evid. 408 (offers of settlement are "not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible."). Furthermore, pursuant to the OPA regulations, once Smith declined the offer, the offer was "automatically void[ ]...." 33 C.F.R. § 136.115(b). In addition, on this point, the NPFC noted:

> Based on Smith's representations that the oil originated offsite and was only passing through the Smith property via the conduit when it discharged onto the Smith property, the NPFC initially offered Smith reimbursement of its removal costs associated with the discharge at the culvert. However, based on subsequent information and documentation put into the administrative record, the NPFC now determines that the oil discharged at the culvert did not originate from the UDC tanks and mi-

grate through the culvert to the Smith property.

A.R. at 17. There is nothing arbitrary or capricious about the fact that the agency initially sought to avoid the costs of litigation and pay Smith what it believed to be reasonable costs based on Smith's proffered version of the facts and later, after having the time to evaluate the evidence and Smith's claims, determining that payment to Smith was not warranted. This is often what occurs in the give and take environment of the litigation process.

■ Finally, Smith argues that the Coast Guard's failure to designate who the responsible party was supports Smith's argument that it is not the responsible party. Smith Mem. at 17 (citing 33 U.S.C. § 2714). The NPFC stated that this non-designation did not support a finding in favor of Smith:

> Failure to designate a source and its owner or operator does not mean that there is no responsible party. In this case, the NPFC determined that there was no potential for claims; therefore, there was no designation. On the other hand, the EPA Order clearly identified Smith as the responsible party liable for removal actions.

A.R. at 22. The applicable statutory provision states that "the President shall, *where possible and appropriate*, designate the source or sources of the discharge or threat." 33 U.S.C. § 2714(a) (emphasis added). However, nothing in the statute mandates such a designation. In the absence of a mandatory duty to designate a source of the spill, the Court cannot conclude that the agency's failure to designate a source therefore makes its decision that Smith was the responsible party arbitrary or capricious, or contrary to law.

Where the agency's explanation for its conclusion is reasonable, the APA does not permit the Court to substitute its judg-

ment for that of the agency. *See International Marine Carriers v. Oil Spill Liability Trust Fund*, 903 F.Supp. 1097, 1106 (S.D.Tex.1994) (granting summary judgment to the government and concluding that Coast Guard's conclusion that party's contractual relationship between operator and fuel terminal where spill occurred was reasonable and hence not arbitrary or capricious). In this case, the Court concludes the evidence supports the NPFC's decision. Namely, the evidence supports the NPFC's findings that, assuming the culvert qualified as an OPA Facility, there was oil present in the Site's soil; that there was no leak of oil into the culvert from an unknown OPA Facility; that Smith had notice of the oil on its property before the discharge; and that the cause of the spill was Smith's contractor's excavation activities, which precludes Smith from asserting any third party defense to liability. On the other hand, the Court cannot find that the evidence supports Smith's theory that an unknown facility caused a discharge of oil into the culvert, assuming that the culvert qualifies as a navigable water. However, even accepting Smith's version of the events as true, Smith offers *no* convincing explanation for why the alleged discharge *into* the culvert, allegedly caused by an unknown source, is the relevant discharge in this case, when clearly the discharge that is the subject of the NPFC's decision is the discharge of oil *from* the culvert into Soapstone Creek, which was clearly caused by Smith's contractor's excavation activities. Further cause for the Court's conclusion is the fact that, pursuant to the applicable regulations, Smith bore "the burden of providing all evidence, information, and documentation deemed necessary by the ... NPFC, to support [its] claim." 33 C.F.R. § 136.105. The Court cannot conclude, in light of the evidence it had before it, that the NPFC's decision was arbitrary or capricious, or contrary to law. At most,

Smith's arguments convince the Court that the discharge in this case was not even encompassed within the OPA, as the culvert was not an OPA facility. In any event, the Court cannot conclude that the agency's decision was arbitrary and capricious or contrary to law because it assumed that the culvert qualified as an OPA facility, given the agency's rejection of Smith's causation theory and Smith's inability to show that it was entitled to reimbursement regardless of the culvert's status.

## 2. Whether There is Evidence of Bad Faith by the Agency

Smith makes a series of accusations and allegations concerning why the Court should conclude that the agency has acted in bad faith in this case. The Court first notes that it has, upon a thorough review of the administrative decision and record, concluded that the agency did not act arbitrary or capriciously or contrary to law in determining that Smith was not entitled to reimbursement from the Fund. In support of its bad faith argument, Smith contends that the defendant misstates the holding of applicable cases; falsely represented that Smith submitted its removal claims late; falsely stated that Smith failed to provide evidence that the culvert was abandoned; and falsely indicates the meaning of the FOSC's Order.

"An agency acts in bad faith when it engages in willful misconduct." *United States v. Iron Mountain Mines, Inc.*, 987 F.Supp. 1250, 1260–61 (E.D.Cal.1997). However, the actions set forth by plaintiff do not demonstrate willful misconduct by the agency; rather, the allegations mainly concern the issue this Court was called upon to decide—whether the agency acted arbitrarily and capriciously, or in violation of the law. While, if the allegations made by Smith had been proven true, the Court

may have been justified in finding that the agency acted arbitrary and capriciously or otherwise contrary to law by relying on a misunderstanding of case law or inaccurate information, the Court does not find that to be the case here. Accordingly, the Court concludes that plaintiff has failed to establish bad faith on the part of the agency. *See id.* (holding that plaintiff failed to establish agency bad faith and noting that the majority of plaintiff's allegations merely "invit[ed] the court to decide whether the EPA's decisionmaking was arbitrary and capricious.") (citation omitted).

## III. Conclusion

The Court concludes that the agency's decision in this case is rationally based on the evidence in the record and was not in any way arbitrary or capricious or otherwise in violation of the APA. Although the Court has denied the government's motion for summary judgment without prejudice based on its failure to submit a proper statement of material facts not in dispute, because the Court concludes that filing additional pleadings is unnecessary and unwarranted, the Court will deny plaintiff's motion for summary judgment and *sua sponte* enter summary judgment in favor of the defendants. *See Celotex Corp.*, 477 U.S. at 326, 106 S.Ct. 2548 (district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte,* so long as the losing party was on notice that she had to come forward with all of her evidence.) (citation omitted); *Athridge v. Rivas,* 141 F.3d 357, 361 (D.C.Cir.1998) (" 'While district courts possess the authority to enter summary judgment against a party *sua sponte* ... that authority may only be exercised so long as the losing party was on notice that [it] had to come forward with all her evidence.' ") (citations omitted); *Jones v. Union Pacific R.R. Co.,* 302 F.3d 735, 740 (7th Cir.2002) ("Where there are no issues of material fact in dispute, a district judge may grant summary judgment in favor of

the non-moving party or may grant summary judgment even though no party has moved for summary judgment.") (citation omitted). The Court finds this result particularly appropriate here since plaintiff was fully on notice of the need to produce all of its evidence in support of its motion for summary judgment and was able to fully respond to the defendants' proffered arguments in support of their cross-motion for summary judgment. Thus, for all the reasons stated above, summary judgment is entered for the defendants.

## *ORDER*

In accordance with the Court's Memorandum Opinion that accompanies this Order, it is hereby

**ORDERED** that Plaintiff's Motion to Strike [# 43] is granted in part and denied in part. It is further

**ORDERED** that the Government's Cross–Motion for Summary Judgment [# 36] is denied without prejudice and that the government's reply in support of its motion for summary judgment is stricken from the record. It is further

**ORDERED** that the Plaintiff's Motion for Summary Judgment [# 31] is denied. It is further

**ORDERED** that summary judgment is entered *sua sponte* in favor of the defendants.